# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GEO-ENERGY PARTNERS-1983 LTD.,
          *Plaintiff-Appellant,*

          v.

KEN SALAZAR, in his capacity as
Secretary of the the Interior,
United States Department of the
Interior; RONALD WENKER, In his
capacity as Director of the Nevada
State Office, Bureau of Land
Management, United States
Department of the Interior;
INTERIOR BOARD OF LAND APPEALS,
          *Defendants-Appellees.*

No. 08-16216

D.C. No.
3:06-cv-00612-BES-
RAM

OPINION

Appeal from the United States District Court
for the District of Nevada
Brian E. Sandoval, District Judge, Presiding

Argued and Submitted
March 8, 2010—San Francisco, California

Filed July 27, 2010

Before: Cynthia Holcomb Hall, John T. Noonan and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas

10769

**COUNSEL**

John L. Clark, Goodin, MacBride, Squeri, Day & Lamprey, LLP, San Francisco, California, for the plaintiff-appellant.

Gregory A. Brower and Holly Vance, United States Attorney's Office for the District of Nevada, Reno, Nevada, for the defendants-appellees.

**OPINION**

THOMAS, Circuit Judge:

This appeal presents the question of whether the procedures for periodic revision of units in the 1988 Amendments to the Geothermal Steam Act apply to pre-amendment contract provisions. Under the circumstances presented by this case, we conclude that they do not, and we affirm the judgment of the district court.

I

In 1970, Congress enacted the Geothermal Steam Act, 30 U.S.C. §§ 1001 *et seq.*, to promote the development of geothermal leases on federal lands. *Wagner v. Chevron Oil Co.*, 321 F. Supp. 2d 1195, 1198 (D. Nev. 2004). The Geothermal Steam Act authorizes the United States Bureau of Land Management ("BLM") to issue geothermal leases that provide for the right to explore and develop geothermal resources on federal property. The term "geothermal resources" refers to the

heat or energy found in steam, hot water, or geothermal formations. 30 U.S.C. § 1001(c) (2000)[1].

A

Multiple geothermal leases held by one or more lessees in the same geographic area are typically combined into a single unit through a unit agreement. 30 U.S.C. § 1017. The unit agreement provides for several tracts of land to be explored and developed as if all the tracts were one parcel. The purpose of the unit agreement is to provide for more efficient development and production of geothermal resources.

The terms of a unit agreement determine how a unit will be administered, including when the agreement is effective, when it will contract or expire, how it will be configured, what the diligent drilling requirements will be, and when a participating area will be established. Once a unit is formed, a unit operator is designated to manage the unit and represent the lessees in developing the geothermal resources. Unit agreements become effective only upon BLM approval.

The primary term of a federal geothermal lease is ten years. 30 U.S.C. § 1005(a). Under the statute and regulations as they existed at the time of the BLM decision at issue in this case, if a lessee developed a well capable of commercial production during the primary term, the lease could continue for an additional term up to forty years. *Id.*; 43 C.F.R. § 3200.1 (2002). The additional term would continue so long as geothermal resources were produced or utilized in commercial quantities. 43 C.F.R. § 3207.10(b) (2002).

---

[1]The majority of citations to statutes and regulations in this opinion are to those provisions as they existed at the time of the BLM decision challenged in this case, May 12, 2003, while citations without a specific date are to the current version of the statute or regulation if unchanged since May 2003.

BLM may extend a non-producing lease for two successive five-year periods if lessees meet certain conditions. First, a lease could be extended if the lessee made a bona fide effort to produce or utilize geothermal resources in commercial quantities. This was called a "diligent efforts" extension. 43 C.F.R. § 3208.10(a)(2) (2002). Second, a lease could be extended to match the term of its unit so long as the lease was committed to the unit and its term would expire before the unit term would expire. This was called a "unit commitment" extension. 43 C.F.R. § 3208.10(a)(4) (2002). Third, a lease could be extended if a well capable of producing geothermal resources was drilled. 43 C.F.R. § 3208.10(b) (2002). Extensions authorized by these provisions did not become effective without BLM approval. 43 C.F.R. § 3208.11(b) (2002). BLM could also grant extensions under its discretionary authority.

This appeal involves geothermal leases in the Fish Lake II Unit ("Fish Lake Unit"). The unit agreement in this case ("Fish Lake Unit Agreement") was based on the model unit agreement set out at 43 C.F.R. § 3286.1 (2002). Under both the Fish Lake Unit Agreement and the model agreement, BLM was authorized to postpone obligations established under the unit agreement.[2] *Id.*.

Under both agreements, if a unit operator determined that a unit well was capable of commercial production, it would propose establishing a participating area. A participating area is a part of the unit determined to be commercially productive based on the results of well testing. BLM approval is required for all participating areas.

---

[2]Article 22.1 of the Fish Lake Unit Agreement provides:

> Notwithstanding any other provisions of this agreement, the [BLM] Director, on his own initiative or upon appropriate justification by the Unit Operator, may postpone any obligation established by and under this Agreement to commence or continue drilling or to operate on or produce Unitized Substances from lands covered by this Agreement when in his judgment, circumstances warrant such action.

Under both the Fish Lake Unit Agreement and the model agreement, the unit would "contract" to the size of the participating area unless "diligent drilling operations are in process on an exploratory well" five years after the participating area's formation. 43 C.F.R. § 3286.1 (2002); The purpose of this provision was to provide incentive for the unit operator to explore and develop portions of the unit that have not been determined to be commercial. If a unit contracts, the unit and participating area become the same. Once a unit contracts, the leases outside the participating area continue only if they are in their primary term or they qualify for extensions as independently functioning leases. *Id.*

Contraction in this case was governed by Article 4.3 of the Fish Lake Unit Agreement: "[U]nitized lands . . . no part of which is entitled to be within a Participating Area on the fifth anniversary of the effective date of the initial Participating Area established under this Agreement, shall be eliminated automatically from this Agreement effective as of said fifth anniversary and such lands shall no longer be part of the Unit Area and shall no longer be subject to this Agreement unless diligent drilling operations are in progress on an exploratory well on said fifth anniversary . . . ."

Pursuant to the 1988 amendments to the Geothermal Steam Act, Pub. L. 100-443, 102 Stat. 1766, and separately from the above process, BLM reviews a unit agreement every five years to determine if lands within the unit are still necessary for unit operations. Those lands that are determined to be no longer reasonably necessary for unit operations are eliminated from the unit. The elimination must be based on scientific evidence and shown to serve geothermal conservation and management purposes. 30 U.S.C. § 1017(f).

B

The leases committed to the Fish Lake Unit were issued pursuant to the Geothermal Steam Act of 1970. The first com-

mercial well in northern Fish Lake Valley was completed in 1984 as part of the diligent development required by the Fish Lake I Unit, which terminated in 1988 for lack of diligent development when the unit failed to meet its drilling obligations. Geo-Energy Partners-1983 LTD ("Geo-Energy") acquired the interests of one of the partners in the prior Fish Lake Unit at some point between 1982 and 1985. The leases in that defunct unit included all of the leases involved in this appeal. Those 12 leases were scheduled to expire because they were beyond their primary terms, but BLM approved extensions for all of them.

In January 1987, special legislation extended five of those leases to December 31, 1988: N-8421, N-8428, N-9647, N-10311 and N-17777. On February 10, 1989, BLM approved first diligent efforts extensions for those leases, extending them to December 31, 1993. On August 19, 1991 BLM granted a first diligent efforts extension through August 31, 1996, for leases N-31991, N-31992, and N-31993.

In 1992, Geo-Energy and Magma Power Company ("Magma") pooled their leases into a joint venture, the Magma/Geo-83 JV ("JV"), and signed a unit agreement to establish the Fish Lake II Unit. The Fish Lake Unit Agreement designated the Fish Lake Power Company ("FLPC"), a Magma subsidiary, as Unit Operator. The JV was designated the working interest owner, but all the rights and responsibilities for Unit operations and exploration, production, and utilization of the unitized resources were delegated to FLPC. The Fish Lake Unit Agreement provided for automatic contraction five years after the initial participating area was established "unless diligent drilling operations [were] in progress on an exploratory well on said fifth anniversary." Fish Lake Unit Agreement, Article IV, Section 4.3.

On October 16, 1992, BLM approved first diligent efforts extensions for four leases, extending them to September 30, 1997: N-36616, N-36617, N-36618, and N-36619. In Novem-

ber 1993, BLM approved second diligent efforts extensions for leases N-8421, N-8428, N-9647, N-10311, and N-17777, extending them to December 31, 1998.

On March 3, 1994, BLM determined the Fish Lake Unit had met its initial diligent development obligation by drilling a well (No. 81-13 on lease N-9647) capable of producing geothermal resources in paying quantities. On September 21, 1994, BLM issued a decision declaring lease N-9647 in "additional term," and under the Fish Lake Unit Agreement, no further diligent development was required until the Unit contraction date. BLM's decision advised that contraction would occur five years after December 1, 1993, unless diligent drilling occurred at that time. The decision also extended the following seven leases to November 30, 1998: N-31991, N-31992, N-31993, N-36616, N-36617, N-36618, N-36619. BLM did not extend the remaining five leases because they had already received their second diligent efforts extensions in 1993: N-8421, N-8428, N-9647, N-10311, and N-17777.

On April 27, 1995, BLM changed the effective start date of the participating area ("PA") from December 1, 1993 to May 1, 1995. Thus, no further diligent drilling was required to avoid contraction until the new contraction date, May 1, 2000.

In 1997, relations among Geo-Energy, Magma, and FLPC deteriorated. In 1995, FLPC, the designated Unit Operator, had decided to devote the Fish Lake Valley energy sales contract to a Cal Energy geothermal project in California, which caused Geo-Energy to sue for breach of contract in 1997. On July 7, 1998, the court entered judgment in favor of Magma and FLPC on this claim, and the decision was affirmed.

Following the May 1, 1995 commerciality determination, it was up to FLPC as Unit Operator and the JV as Working Interest Owner to decide how to pursue diligent development, but they were unable to reach agreement on the issue. In the commerciality determination, BLM warned Geo-Energy and

Magma that any lease outside the PA, beyond its primary period, and not receiving any extension of its individual terms, would terminate upon contraction of the Fish Lake Unit. The decision was not appealed by either party.

Relations between Geo-Energy and Magma continued to deteriorate. The JV terminated in May 1998. The parties continued to disagree over how to dissolve their partnership. Geo-Energy accused Magma of failing to provide information vital to performing the drilling obligations within the Unit. Only by filing a FOIA request with the BLM was Geo-Energy able to obtain all of the geological and other information relating to the geothermal resources from Magma. Geo-Energy also had conflicts with FLPC during this time, accusing it of failing to plug wells before relinquishing them and failing to give Geo-Energy notice of meetings and Unit-related proposals with the BLM. On June 3, 1999, FLPC submitted a letter to the BLM expressing its desire to resign as Unit Operator.

At Geo-Energy's request in letters dated April 28 and May 11, 2000, and based on Geo-Energy's representations regarding its plan to acquire a new working interest owner and unit operator, and initiate exploration and development on leases outside the PA but within the Unit, BLM postponed the scheduled Unit contraction date of May 1, 2000. BLM agreed to postpone Unit contract until April 30, 2001, provided Geo-Energy met certain operational and other conditions. First, the new Unit Operator would be required to submit permit applications for nine temperature gradient wells and then drill those wells and a production well before the new contraction date. Second, Fish Lake Green Power Company ("FLGPC"), a Geo-Energy subsidiary, would become the new Unit Operator only if a substantial bond were posted.

BLM and Geo-Energy discussed what the bond should be during meetings and telephone calls. BLM explained that a $750,000 bond might be needed because the cost to plug unit wells and reclaim the surface had been estimated by Magma

several years earlier to be $1.5 million dollars. BLM noted that Geo-Energy's inability to develop the unit previously, the fact that they did not possess any actively producing leases, the company's history of lack of compliance, plus the involvement of a man, John E. Deymonaz, who had worked for a previous company that had walked away from wells without properly plugging them, all contributed to the need for a bond that was likely to be significantly greater than the normal amount requested.

Sometime in 2000, FLGPC submitted permit applications to BLM for nine temperature gradient wells. BLM found the applications deficient, but according to the BLM, the company never responded to fix the deficiencies.

In December 2000, FLPC withdrew its resignation as Unit Operator. Geo-Energy objected to the BLM's acceptance of this, claiming the FLPC's resignation had become effective over a year earlier. On January 17, 2001, BLM sent a letter to Geo-Energy clarifying its position regarding the status of the Unit Operator, stating that submission of a resignation as Unit Operator did not automatically relieve the Unit Operator of any authority or responsiblity related to the development and production of unitized resources. BLM explained that it had never approved FLPC's resignation, and FLGPC had never satisfied the conditions set out in BLM's May 25, 2000 letter. Therefore, FLPC had never been removed as Unit Operator. *Id.*

On February 21, 2001, FLGPC submitted a second set of permit applications for the temperature gradient wells. According to BLM, it approved these applications on March 27, 2002, and accepted the proposed $50,000 bond, but no drilling ever resulted.

On April 12, 2001, BLM sent a letter expressing its continued concerns regarding the lack of diligent development in the Unit area, the lack of new geologic information, and the

need for Geo-Energy and FLPC to resolve their dispute to avoid Unit contraction to the PA, as provided for by Section 4.3 of the Fish Lake Unit Agreement. Geo-Energy responded on April 19, 2001, with a request that BLM postpone contraction again while Geo-Energy and Magma continued to negotiate the sale of Magma's interests to ORMAT, a Nevada geothermal operator. ORMAT joined in that request. Geo-Energy conceded in this letter that disagreements with FLPC were issues "the companies must resolve themselves." BLM informally agreed to extend the contraction deadline.

On November 7, 2001 BLM sent a letter to Magma and Geo-Energy that after extending the contraction terms of the Fish Lake Unit Agreement several times in the preceding two years to allow the parties time to complete their negotiations, and upon recently learning that they had been unable to conclude an agreement, BLM had decided timely and diligent development of the Fish Lake Unit area appeared unlikely. Therefore, absent documentation justifying continuation of the extension, BLM stated that it would contract the Fish Lake Unit to the PA effective December 15, 2001, noting that many leases outside the PA would expire.

At FLPC's request, BLM agreed to postpone contraction until March 1, 2002, to allow negotiations with ORMAT to continue. BLM emphasized that the postponement was contingent on the parties' commitment to finalize an agreement.

On February 8, 2002, Geo-Energy objected to any unit contraction. While the company admitted no drilling had occurred in the Fish Lake Unit in seven years, and no exploratory work had taken place, and that Geo-Energy was unable to reach an agreement with ORMAT, Magma, and FLPC, it accused these companies of trampling on its rights and frustrating the Fish Lake II project. On February 13, 2002, BLM responded to Geo-Energy by reiterating its agreement to postpone contraction until March 1, 2002, to allow negotiations with ORMAT to continue, but warned it would contract the

Unit if no agreement was reached on that date. BLM directed Geo-Energy to communicate directly with FLPC about any issues rather than the BLM, since FLPC, as Unit Operator, was BLM's point of contact regarding Fish Lake Unit issues pursuant to the Fish Lake Unit Agreement. BLM also noted in this letter that it had shown great flexibility in postponing the contraction several times to allow the parties to work out their differences, and that the public interest now required the situation to be resolved.

Geo-Energy replied in a letter on February 25, 2002. In general, Geo-Energy complained that BLM had not provided adequate information regarding the proposed contraction to enable Geo-Energy to respond, and contended that it was BLM's responsibility to compel diligent development of the Fish Lake Unit from the Unit Operator, regardless of the lack of an agreement between ORMAT and FLPC. Geo-Energy requested the BLM postpone action on contraction until arbitration proceedings concerning Geo-Energy's and Magma's dissolution of the JV concluded.

On March 19, 2002, BLM sent a letter to FLPC and Geo-Energy commenting on the parties' lack of action to diligently develop the Fish Lake Unit and the negative impact of that inaction on the public interest. BLM stated that in six months BLM would either contract the Fish Lake Unit to the PA or, given the failure to commence production, terminate all the leases in the Fish Lake Unit area. BLM also requested FLPC's views on the Fish Lake Unit revision described in the letter.

In a May 6, 2002, letter to FLPC, BLM requested a plan within thirty days "describing the activities you will conduct this year which will meet the diligent development requirement." BLM cautioned that it expected any activities identified in the plan would be completed "in the time frame provided," and noted it would take further action, including possible unit contraction or cancellation of all leases in the

Fish Lake Unit, if the goals were not met. FLPC responded that its plan was limited to marketing the resource, and that it was having difficulty developing the resource due to its remote location and limited electrical sources.

In response, Geo-Energy sent a letter to the BLM complaining that in seven years the BLM had not nothing to compel FLPC to undertake diligent development, and should have removed FLPC as the operator. In addition, Geo-Energy complained about the "exorbitant" amount of the bond BLM purportedly had demanded for Fish Lake Unit operations, and stated that FLGPC would not agree to succeed as Unit Operator unless FLPC plugged and abandoned wells and reclaimed the land.

In July 2002, BLM revised the Fish Lake Unit boundaries pursuant to the requirements set out in 30 U.S.C. § 1017, thereby terminating several leases located outside the newly-configured Unit. Geo-Energy and FLPC both agreed to the revision. The revision did not affect the PA.

On August 21, 2002, ORMAT informed the BLM that it was terminating all negotiations for interests in the Unit. At a meeting on October 31, 2002, BLM stated that it would terminate the Fish Lake Unit and leases if FLPC did not immediately acquire a sales contract.

In November 2002, Geo-Energy advised BLM that Geo-Energy and Magma had executed a stipulation in the arbitration proceedings, pursuant to which Magma had agreed to plug and abandon all Wells in the Fish Lake Unit and transfer all leases to Geo-Energy. Geo-Energy stated that it had the option of maintaining only well No. 81-13 on lease N-9647, the "only true commercially feasible well in the unit." Alluding to past bonding problems, Geo-Energy proposed a $50,000 bond for the well. BLM does not appear to have responded to the proposed bond at the time, apparently because, according to the later May 2003 decision, in 1993

FLPC, the Unit Operator, had estimated the costs to plug and abandon Unit wells and reclaim the Fish Lake Unit area would be $1.5 million, and BLM had previously rejected a $50,000 bond as inadequate and contrary to the public interest.

On November 25, 2002, BLM received FLPC's request to assign the Fish Lake Unit leases to Geo-Energy. In a decision dated December 20, 2002, BLM declared the Fish Lake Unit terminated. Geo-Energy filed its appeal to the Interior Board of Land Appeals ("IBLA"), but BLM moved to vacate the decision and remand the case, having determined that termination at that time was inappropriate. The IBLA granted the request by order dated April 14, 2003. *Id.*

Geo-Energy thereafter submitted letters dated April 24, 25, and May 7, 2003, seeking approval of lease extensions, lease assignments, a well plugging and abandonment plan, and a $50,000 bond.

C

On May 12, 2003, BLM issued the decision at issue in this case, declaring the Fish Lake Unit contracted to its PA, and determining that the leases eliminated from the contracted unit were ineligible for extensions either because they had already received two successive extensions or because a second extension would not be successive to the first. Additionally, the decision addressed pending lease assignments, Fish Lake Unit operations and a bond, and plugging and abandoning wells in the former Fish Lake Unit area. *Id.* Geo-Energy filed a petition for a stay that was denied. *Id.*

Geo-Energy appealed the BLM's decision to the IBLA, which upheld the decision on September 14, 2006. Geo-Energy appealed to the United States District Court for the District of Nevada, which also upheld the decision. Geo-Energy then filed a timely notice of appeal with this Court.

II

We review a district court's grant of summary judgment in an administrative review action de novo. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004). In reviewing decisions of the IBLA, we exercise a limited standard of review. *Baker v. United States*, 613 F.2d 224, 226 (9th Cir. 1980). We review the case from the same position as the district court and will reverse the IBLA's decision only if that decision is arbitrary, capricious, an abuse of discretion, or contrary to law. *Gilmore v. Lujan*, 947 F.2d 1409, 1411 (9th Cir. 1991). This standard is narrow and a reviewing court may not substitute its judgment for that of the agency. *Mount St. Helens Mining and Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 728 (9th Cir. 2004). We must determine whether the agency articulated a rational connection between the facts and the choice made. *Id.* In addition, the decision must demonstrate that it was based on a consideration of the relevant factors. *Id.*

III

On appeal, Geo-Energy argues the IBLA's decision should be overturned because the BLM made its decision in contravention of 30 U.S.C. § 1017, and it was therefore, "contrary to law." As amended in 1988, the Geothermal Steam Act thereafter required the Secretary to conduct periodic review of the unit agreements, and "after notice and opportunity for comment, eliminate from inclusion in such plan any lease or part of a lease not regarded as reasonably necessary to cooperative or unit operations under the plan." 30 U.S.C. § 1017 (2000). Further, the statute provides that "[s]uch elimination shall be based on scientific evidence." *Id.* The Fish Lake Unit Agreement, on the other hand, states that unit area lands not part of the Participating Area "shall be eliminated automatically" five years after the initial Participating Area is established "unless diligent drilling operations are in progress." Fish Lake Unit Agreement § 4.3.

**[1]** Geo-Energy argues the unit contraction under the Fish Lake Unit Agreement cannot be automatic, but rather, is subject to the restrictions on revision in § 1017. BLM, on the other hand, counters that § 1017 sets out a separate and parallel review process that has no effect on the automatic contraction provision in the Fish Lake Unit Agreement. The IBLA held that the processes are separate and upheld the BLM's automatic contraction of the Fish Lake Unit to the PA. Therefore, the question we must answer is whether the reference to "elimination" in the statute is merely to the specific type of elimination described therein, or rather if the requirements apply to *any* elimination of land from a unit agreement. There is no definitive guidance on the proper relationship of the Fish Lake Unit Agreement and § 1017.

"We start, as always, with the language of the statute." *Williams v. Taylor*, 529 U.S. 420, 431 (2000). "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (internal quotation marks omitted). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Id.* at 341.

**[2]** Thus, we turn to the text of 30 U.S.C. § 1017. First, the specific language setting out the revision requirements suggest they only apply to those types of eliminations, rather than *all* eliminations. The 1988 Amendments added the following paragraph after the first full paragraph of § 1017:

> No more than five years after approval of any cooperative or unit plan of development or operation, and at least every five years thereafter, the Secretary shall review each such plan and, after notice and

opportunity for comment, eliminate from inclusion
in such plan any lease or part of a lease not regarded
as reasonably necessary to cooperative or unit opera-
tions under the plan. . . . Such elimination shall be
based on scientific evidence, and shall occur only
when it is determined by the Secretary to be for the
purpose of conserving and properly managing the
geothermal resource. Any lease or part of lease so
eliminated shall be eligible for an extension under
subsection (c) or (g) of section 1005 of this title *if it
separately meets the requirements for such an
extension.*

Pub. L. No. 100-443, 102 Stat. 1766 (1988) (emphasis added).

Geo-Energy focuses on the language in the penultimate
sentence in section 1017, which states that, "elimination *shall*
be based on scientific evidence, and shall occur *only* when it
is determined . . . to be for the purpose of conserving and
properly managing the geothermal resource." (Emphasis
added in appellant's opening brief). From this Geo-Energy
argues *any* elimination from a unit agreement must meet these
requirements.

**[3]** However, Geo-Energy's interpretation ignores the first
word of the sentence: "*Such* elimination shall be based on sci-
entific evidence." When read together with the beginning of
the paragraph, it appears the requirements apply only to the
five-year review and revision process. "Such" indicates that
the requirements are tied only to the elimination described
immediately prior, that of the five year revision and review,
rather than *any* elimination from the unit for any reason.
Reading the paragraph as a whole, rather than the sentences
in isolation, we conclude that the requirements for elimination
only apply to "such" eliminations as described immediately
prior—those for the five year review and revision of unit
agreements. The section does not state that it applies to other
situations, or all eliminations generally. In addition, presum-

ably Congress knew of the model agreement in the implementing regulations, and made no indication in the text or legislative history, that such automatic contraction provisions were no longer viable, and neither did the BLM.

Second, the context of the language, specifically, the last sentence of section 1017, relating to lease extensions authorized by section 1005 for leases eliminated in the periodic review process, provides support for the above interpretation of the statute's text. As stated, the 1988 Amendments added the following paragraph to § 1017:

> No more than five years after approval of any cooperative or unit plan of development or operation, and at least every five years thereafter, the Secretary shall review each such plan and, after notice and opportunity for comment, eliminate from inclusion in such plan any lease or part of a lease not regarded as reasonably necessary to cooperative or unit operations under the plan. . . . Such elimination shall be based on scientific evidence, and shall occur only when it is determined by the Secretary to be for the purpose of conserving and properly managing the geothermal resource. Any lease or part of a lease so eliminated shall be eligible for an extension under subsection (c) or (g) of section 1005 of this title *if it* separately *meets the requirements for such an extension*."

Pub L. No. 100-433 § 4 (emphasis added).

Section 1005 outlines the prerequisites for extending a lease after five years following the unit's formation. By negative implication, § 1005 outlines the prerequisites for eliminating a lease by "contraction." As the BLM has defined the term, "contraction" is the refusal to grant a lease extension pursuant to § 1005.

In particular, when BLM made its decision to contract the Fish Lake II Unit, subsection 1005(c) provided:

> (c) Cooperative or unit plan for drilling operations; extension of term; renewal
>
> Any lease for land on which, or for which under an approved cooperative or unit plan of development or operation, actual drilling operations were commenced prior to the end of its primary term *and are being diligently prosecuted at that time* shall be extended for five years and so long thereafter, but not more than thirty-five years, as geothermal steam is produced or utilized in commercial quantities. *If, at the end of such extended term, steam is being produced or utilized in commercial quantities*[3] *and the lands are not needed for other purposes*, the lessee shall have a preferential right to a renewal of such lease for a second term in accordance with such terms and conditions as the Secretary deems appropriate.

30 U.S.C. § 1005(c) (emphasis added) (2000).[4]

At the same time, Subsection 1005(g) provided:

> (g) Five-year extensions; conditions

---

[3]The statute defined "produced or utilized in commercial quantities" as:

> [T]he completion of a well producing geothermal steam in commercial quantities. Such term shall also include the completion of a well capable of producing geothermal steam in commercial quantities *so long as the Secretary determines that diligent efforts are being made* toward the utilization of the geothermal steam.

30 U.S.C. § 1005(d) (emphasis added) (2000).

[4]Pursuant to the 2005 amendments to the Geothermal Steam Act, this provision was relocated and renumbered as 30 U.S.C. § 1005(g). *See* Pub. L. 109-58, § 231(2).

> (1) Any geothermal lease issued pursuant to this chapter for land on which . . . geothermal steam has not been produced or utilized in commercial quantities by the end of its primary term, or by the end of any extension provided by subsection (c) of this section, may be extended for successive 5-year periods, but totaling not more than 10 years, *if the Secretary determines that the lessee has met the bona fide effort requirement of subsection (h)*[5] *of this section* . . . .

30 U.S.C. § 1005(g) (2000) (emphasis added).[6]

**[4]** To summarize, when the BLM decided to contract the Fish Lake II Unit in May 2003, 30 U.S.C. § 1017 outlined the procedures for "review and revision," under which the elimination of leases must be "based on scientific evidence" and "for the purpose of conserving and properly managing the geothermal resource." That section expressly provided, however, that a lease eliminated by "review and revision" could still be preserved under former 30 U.S.C. § 1005(g) or (c), but the lease had to "separately" meet the requirements of those subsections. Those subsections, in turn, required "bona fide efforts" or the "diligent[ ] prosecut[ion]" of drilling operations. These were the "separate" criteria the BLM considered to determine whether to eliminate a lease by contraction, i.e., by refusing to grant an extension.

**[5]** Accordingly, the interplay between 30 U.S.C. §§ 1017 and 1005 strongly suggests that the requirements for eliminat-

---

[5]Subsection (h) defines "bona fide effort" as the submission of "a report to the Secretary demonstrating bona fide efforts (as determined by the Secretary) to produce or utilize geothermal steam in commercial quantities for such lease, given the then current economic conditions." 30 U.S.C. § 1005(h) (2000). This subsection was stricken by the 2005 amendments to the Geothermal Steam Act. *See* Pub. L. 109-58, § 231(1).

[6]Former subsection (g) was stricken by the 2005 amendments to the Geothermal Steam Act. *See* Pub. L. 109-58, § 231(1).

ing a lease through review and revision are wholly separate from those that govern the elimination of a lease through contraction.[7]

---

[7]The legislative history surrounding the passage of the 1988 Amendments does not shed much light on the reach of the statute. None of the discussion surrounding the Amendments specifically mentions the review and revision requirements, focusing instead on the liberalization of lease extensions and the protection of geothermal resources in National Parks embodied in other sections of the Amendments. *See, e.g.*, 134 Cong. Rec. S11266-05 (Aug. 9, 1988) (statement of Sen. Melcher) ("S. 1889 provides for the extension of Federal geothermal leases if the lessee meets certain criteria. The legislation also contains park protection provisions, including language to ensure that the world-renowned thermal features of Yellowstone National Park are protected from any adverse impact from geothermal development."); 134 Cong. Rec. H7372-02 (Sept. 9, 1988) (statement of Rep. Rahall) ("[T]he purpose of S. 1889 as amended is to provide for the orderly development of Federal geothermal resources, and to ensure the protection of significant thermal features within units of the National Park System from potential geothermal development activities.").

One tangentially related statement provides some illumination. The Senate Report on the Amendment includes a statement from Robert H. Lawton, Deputy Assistant Director of the BLM. His discussion of the proposed addition to Section 1017 (which codified Section 18 of the Geothermal Steam Act of 1970) is as follows:

> We also believe the bill should be modified to clear up one apparent inconsistency in language between section 3 and section 6, in that section 6 would amend section 18 of the Act to direct that leases be eliminated from units if they are no longer necessary for unit operations, while section 3 would amend section 6(a) to protect leases from expiration if they are within a producing unit or one that is capable of production. We suggest that this apparent inconsistency be clarified by adding to section 18 the statement that leases may be eliminated notwithstanding the provisions of 6(a).

S. REP. No. 100-283, at 13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2350, 2359. Congress did not adopt this suggestion, as the final amendment stated that leases so eliminated shall be eligible for extensions under subsections (c) or (g) of section 6 if they separately met the requirements for such extensions, but does not mention 6(a). Pub. L. No. 100-443, 102 Stat. 1766. This suggests Congress only wanted the eliminations to proceed under the specific revision procedures set out in the paragraph, and did not think the elimination procedure should apply to other situations discussed in the amendments.

**[6]** In this situation, given the reasonableness of both BLM and the IBLA's interpretation of the statute, it is not "contrary to law," as is necessary to overturn an administrative agency decision on appellate review. Therefore we affirm the IBLA on this point.

IV

**[7]** Geo-Energy also argues the IBLA's failure to consider whether the BLM properly exercised its discretion to postpone any contractual obligation under Section 22.1 of the Fish Lake Unit Agreement in deciding to contract the unit requires reversal. Geo-Energy concedes in its briefing that it did not raise this issue directly with the IBLA, and did not raise it in the district court. While we generally will not consider issues on appeal that were not raised with the administrative agency, we may do so "when 'exceptional circumstances' warrant such review, notwithstanding the petitioner's failure to present them to the agency." *Reid v. Engen*, 765 F.2d 1457, 1461 (9th Cir. 1985). "In determining whether to require exhaustion, this court balances the agency's interests in applying its expertise, correcting its own errors, making a proper record, enjoying appropriate independence of decision and maintaining an administrative process free from deliberate flouting, and the interests of private parties in finding adequate redress for their grievances." *Litton Industries, Inc. v. Fed. Trade Comm.*, 676 F.2d 364, 369-70 (9th Cir. 1982) (internal quotation marks omitted). For example, "[o]bjective and undisputed evidence of administrative bias would render pursuit of an administrative remedy futile." *Anderson v. Babbitt*, 230 F.3d 1158, 1164 (9th Cir. 2000).

**[8]** There are not exceptional circumstances here to warrant review of an issue not squarely presented to either the IBLA or the district court. The question of whether BLM properly refused to exercise its discretion under Section 22.1 in exercising the automatic contraction provision, while relying in part on facts already contained in the record, is not one

we should decide in the first instance. It directly concerns the agency's interests in "applying its expertise, correcting its own errors, making a proper record, [and] enjoying appropriate independence of decision." *Litton*, 676 F.2d at 369-70. If Geo-Energy had made this argument directly to the IBLA, it would have been able to determine, through its own expertise, whether BLM failed to exercise this discretion in a reasonable manner. It would have given the IBLA the chance to correct its own errors, if in fact, there was an error.

The private interest of Geo-Energy does not outweigh the interests above in this case. Geo-Energy gives no reason for failing to make this argument explicitly to either the IBLA or the district court. That it made the decision to focus on other aspects of the case, which were decided contrary to its interests, and then to come up with new arguments supporting its position on appeal, does not rise to the level of "extraordinary circumstances."

**[9]** In addition, it does not appear that raising the argument would have been "futile" in the sense recognized by the "extraordinary circumstances" doctrine. There is no objective and undisputed evidence of administrative bias that would render pursuit of an administrative remedy "futile." While Geo-Energy has accused the BLM of thwarting its efforts, it has made no such argument about the IBLA, nor did it make such an argument *to* the IBLA. Therefore, that the evidence indicates the IBLA would not have thought the BLM acted arbitrarily and capriciously in refusing to exercise its discretion to give Geo-Energy yet another extension on contraction, is not evidence of "futility" in the way meant by the exception. That it was likely a court would render a decision contrary to a party's interest based on the merits is not itself objective evidence of bias to support futility. Therefore, there are not "exceptional circumstances" warranting review of this issue for the first time in this Court.

V

**[10]** The procedures for periodic revision of units in the 1988 Amendments to the Geothermal Steam Act, codified at 30 U.S.C. § 1017, do not apply to automatic contraction provisions such as the one in the Fish Lake Unit Agreement at issue here. Geo-Energy consistently failed to meet the requirements of the Fish Lake Unit Agreement that would prevent contraction, and despite several extensions over several years, was unable to comply. Contraction under these circumstances was not contrary to law. Second, Geo-Energy failed to make the argument regarding the BLM's exercise of discretion under Article 22.1 of the Fish Lake Unit Agreement below, and exceptional circumstances do not exist such that we will exercise our discretion to decide the issue in the first instance. Therefore, we affirm the decision of the IBLA.

**AFFIRMED.**