**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PIT RIVER TRIBE; NATIVE
COALITION FOR MEDICINE LAKE
HIGHLANDS DEFENSE; MOUNT
SHASTA BIOREGIONAL ECOLOGY
CENTER; SAVE MEDICINE LAKE
COALITION; MEDICINE LAKE
CITIZENS FOR QUALITY
ENVIRONMENT,
        *Plaintiffs-Appellants*,

v.

BUREAU OF LAND MANAGEMENT;
U.S. DEPARTMENT OF THE INTERIOR;
UNITED STATES FOREST SERVICE;
UNITED STATES DEPARTMENT OF
AGRICULTURE; CALPINE
CORPORATION,
        *Defendants-Appellees*.

No. 13-16961

D.C. No.
2:04-cv-00956-
JAM-JFM

OPINION

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted
March 12, 2015—San Francisco, California

Filed July 20, 2015

Before: William A. Fletcher and Morgan Christen, Circuit
Judges, and Roslyn O. Silver,[*] Senior District Judge.

Opinion by Judge Christen

## SUMMARY[**]

### Environmental Law

The panel reversed the district court's order granting
judgment on the pleadings in an action brought by
environmental organizations challenging the Bureau of Land
Management's continuation of 26 geothermal leases in
northeastern California's Medicine Lake Highlands.

The panel held that the district court incorrectly treated
the environmental organizations' claims as arising under only
§ 1005(a) of the Geothermal Steam Act. BLM's 1998
decision to continue the 26 unproven leases in the Glass
Mountain Unit under § 1005(a) was issued simultaneously
with its decision to reverse and vacate its earlier decision to
extend those leases on a lease-by-lease basis under § 1005(g).
The panel held, thus, that the environmental organizations'
challenge to BLM's decisions issued on May 18, 1998
implicated both § 1005(a) and § 1005(g).

[*] The Honorable Roslyn O. Silver, Senior District Judge for the United
States District Court for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

Because BLM must conduct environmental, historical, and cultural review under the National Environmental Policy Act and the National Historic Preservation Act before granting lease extensions under § 1005(g), the panel held that the environmental organizations' claim fell within § 1005(g)'s zone-of-interests, and the organizations had stated a claim under § 1005(g).

The panel declined the environmental organizations' invitation to rule on the merits of its Geothermal Steam Act claims, and remanded for further proceedings.

## COUNSEL

Jason S. George (argued), Evan H. Stein (argued), Certified Law Students, Palo Alto, California; Deborah Ann Sivas, Matthew J. Sanders, and Alicia E. Thesing, Mills Legal Clinic of Stanford Law School, Stanford, California, for Plaintiffs-Appellants.

David Taylor Shelledy (argued), Assistant United States Attorney, and Benjamin B. Wagner, United States Attorney, Sacramento, California, for Defendants-Appellees Bureau of Land Management, United States Department of the Interior, United States Forest Service, and United States Department of Agriculture.

Rosemary Antonopoulos, Dublin, California; Thomas L. Sansonetti, Holland & Hart LLP, Cheyenne, Wyoming, for Defendant-Appellee Calpine Corporation.

## OPINION

CHRISTEN, Circuit Judge:

The Pit River Tribe and several regional environmental organizations (collectively Pit River) appeal from the district court's order granting judgment on the pleadings on Pit River's action challenging the Bureau of Land Management's (BLM) continuation of 26 geothermal leases in northeastern California's Medicine Lake Highlands. Pit River's complaint alleged that BLM's decision violated the Geothermal Steam Act, the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), and the government's fiduciary trust obligation to Indian tribes. The district court concluded Pit River lacked prudential standing to bring its Geothermal Steam Act claims because the claims did not fall within the zone of interests of the Act's lease-continuation provision, 30 U.S.C. § 1005(a).[1] The district court rejected Pit River's other claims on the basis that BLM had no discretion to consider environmental, historical, or cultural interests before continuing the leases under §1005(a).

We conclude that the district court incorrectly treated Pit River's claims as arising under only § 1005(a) of the Geothermal Steam Act. BLM's 1998 decision to *continue* the 26 unproven leases in the Glass Mountain unit under § 1005(a) was issued simultaneously with its decision to

---

[1] In light of the Supreme Court's recent case, *Lexmark International, Inc. v. Static Control Components, Inc.*, the zone-of-interests inquiry may no longer be considered an element of "prudential standing," but the substance of the test remains unchanged for the purposes of this case. 134 S. Ct. 1377, 1387–88 (2014).

reverse and vacate its earlier decision to *extend* those leases on a lease-by-lease basis under § 1005(g).  Thus, Pit River's challenge to the decisions issued on May 18, 1998 implicates both § 1005(a) and § 1005(g).  Because BLM must conduct environmental, historical, and cultural review under NEPA and NHPA before granting lease extensions under § 1005(g), *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 780–84, 787–88 (9th Cir. 2006) ("*Pit River I*"), Pit River's claim falls within § 1005(g)'s zone of interests and Pit River has stated a claim under § 1005(g).  Accordingly, we reverse the district court's decision.

## BACKGROUND

### I.  The Plaintiffs' Interests

The Medicine Lake Highlands are part of the Pit River Tribe's ancestral homeland.  Tribal members "consider the region sacred and continue to use numerous important spiritual and cultural sites within the highlands." *Pit River I*, 469 F.3d at 772.  The complaint alleges that exploration of and development on geothermal leases will interfere with tribal members' use of the Medicine Lake Highlands "for a variety of spiritual and traditional cultural purposes" that "depend on the physical, environmental, and visual integrity of these areas, and their quietude."  The complaint alleges that the non-tribal plaintiffs have environmental, recreational, aesthetic, and scientific interests in the Medicine Lake Highlands that are inconsistent with geothermal development.

### II.  The Geothermal Steam Act

When interest in geothermal power development first began to grow in the 1960s, the United States Department of

the Interior determined that it lacked statutory authority to dispose of geothermal resources on federal land. Robert B. Keiter, *The Old Faithful Protection Act: Congress, National Park Ecosystems, and Private Property Rights*, 14 Pub. Land L. Rev. 5, 9 (1993). Congress recognized the necessity of creating a legal framework governing the development of geothermal resources on federal land, *see Wagner v. Chevron Oil Co.*, 321 F. Supp. 2d 1195, 1198 (D. Nev. 2004), and in 1970 it enacted the Geothermal Steam Act for the express purpose of "promot[ing] the development of geothermal leases on federal lands."[2] *Geo-Energy Partners-1983 Ltd. v. Salazar*, 613 F.3d 946, 949 (9th Cir. 2010) (citing 30 U.S.C. § 1001, *et seq*; *Wagner*, 321 F. Supp. 2d at 1198).

The Geothermal Steam Act authorizes "the Secretary of the Interior to 'issue leases for the development and utilization of geothermal steam' on federal land and in national forests." *Pit River I*, 469 F.3d at 772–73 (quoting 30 U.S.C. § 1002). Geothermal leases on federal land have a primary term of ten years. 30 U.S.C. § 1005(a) (1998). At the end of that term, the Secretary must grant a *continuation* of the lease for a term up to 40 additional years if "geothermal steam is produced or utilized in commercial quantities." *Id.* Section 1005(d) defines "produced or utilized in commercial quantities" to include "the completion of a well capable of producing geothermal steam in commercial quantities so long as the Secretary determines

---

[2] Congress amended the Geothermal Steam Act in 1998 and 2005. Except where otherwise noted, we refer to the statute and regulations in effect when the challenged lease continuations were approved in May 1998. *See Pit River I*, 469 F.3d at 781 (holding that amendments to lease continuation and extension provisions of the Geothermal Steam Act should not be applied retroactively). Both parties acknowledge that this version of the statute and regulations apply in this case.

that diligent efforts are being made toward the utilization of the geothermal steam." Where geothermal steam has not been produced or utilized in commercial quantities by the end of the initial, ten-year lease term, the Secretary may *extend* the lease for successive five-year terms if certain conditions are met. *Id.* § 1005(g). Under § 1005(g)'s five-year extension provision, BLM must conduct a review pursuant to NEPA and NHPA considering the cultural, historical, and environmental effects of its leasing decision before making its lease-extension determination. *Pit River I*, 469 F.3d at 781, 784–89.

The Geothermal Steam Act also authorizes the Secretary to approve "cooperative or unit plan[s]" under which multiple leases are managed as a unit. 30 U.S.C. § 1017 (1998); 43 C.F.R. § 3280.0-2 (1997). The purpose of cooperative or unit plans is to "conserv[e] natural resources," 43 C.F.R. § 3280.0-2 (1997), and "provide for more efficient development and production of geothermal resources." *Geo-Energy Partners-1983*, 613 F.3d at 949. The Secretary has relatively broad discretion to set the terms of a unit plan and to regulate the leases within the plan. 30 U.S.C. § 1017 (1998). The Secretary must review unit plans every five years "and, after notice and opportunity for comment, eliminate from inclusion in such plan any lease or part of a lease not regarded as reasonably necessary to cooperative or unit operations under the plan." *Id.*

## III. The Glass Mountain Leases

The Department of the Interior issued a programmatic environmental impact statement (EIS) in 1973 addressing nationwide implementation of the Geothermal Steam Act. *Pit River I*, 469 F.3d at 773. With several exceptions not relevant

here, the EIS did not address geothermal development in particular locations. Rather, the EIS suggested that issuing individual leases may require subsequent, more particularized EISs. *Id.* In 1981, BLM and the Forest Service issued an Environmental Assessment (EA) evaluating "whether to allow geothermal leasing and casual use exploration on approximately 266,800 acres of National Forest land in the Medicine Lake Planning Unit, and an adjacent 26,750 acres." *Id.* After completion of this EA, the Forest Service issued a Finding of No Significant Impact for potential geothermal leasing in the Medicine Lake Planning Unit of the Modoc, Klamath, and Shasta-Trinity National Forests.

In 1982, BLM entered into a "Unit Agreement for the Development and Operation of the Glass Mountain Area," which eventually included the 26 unproven leases at issue in this appeal. The Unit Agreement included exhaustive rules governing the management of leases within the unit. Among many other provisions, the Unit Agreement required the unit operator to submit a plan of operation establishing deadlines for progress in exploration and ensuring "proper protection of the environment and conservation of the natural resources of the Unit Area." Article 17.4 of the Unit Agreement provided that "[d]rilling and/or producing operations performed . . . upon any tract of Unitized Lands will be accepted and deemed to be performed upon and for the benefit of each and every tract of Unitized Land."

BLM and the Forest Service issued a supplemental EA in 1984, this time addressing "the exploration, development and production phases of the geothermal program." *Id.* at 774. This document recognized the cultural and historical importance of the Medicine Lake area to modern Native American groups. *Id.* at 774–75. Following completion of

the 1984 EA, BLM issued the "Glass Mountain Geothermal Decision Record," authorizing leasing on an additional 41,500 acres within the Medicine Lake Highlands.

Between 1982 and 1988, BLM granted the 26 leases that are the subject of this appeal. In 1989, BLM determined that a different lease within the Glass Mountain Unit was capable of producing geothermal steam in commercial quantities (the "paying-well determination"). In November 1990, one of Calpine Corporation's predecessors[3] requested five-year extensions for 23 leases it owned within the Glass Mountain Unit pursuant to 43 C.F.R. § 3203.1-4(c).[4]

In the course of processing this lease-extension application, BLM's California State Office communicated with the Nevada State Office, which advised that 40-year lease continuations should be granted to all of the unproven Glass Mountain leases pursuant to Article 17.4 of the Unit Agreement. The California Office disagreed, concluding that under § 1005 and its implementing regulations, "the 40 year extension [under § 1005(a)] may only be applied to the lease with the well capable of production and not to the other committed leases in the unit." The California Office reasoned that the statute and its "implementing regulations refer specifically to individual leases . . . , not leases within a

---

[3] At various times relevant to this discussion, other entities owned some or all of the leases at issue here. Calpine was preceded as the Glass Mountain Unit operator by Union Oil Company and California Energy General Corporation. To avoid confusion, and because it does not affect our analysis, we refer to all unit operators and lease owners as "Calpine" or "Calpine's predecessor" throughout this opinion.

[4] 43 C.F.R. § 3203.1-4(c) implements the lease-extension requirements of 30 U.S.C. § 1005(g)(1).

'cooperative plan, communitization agreement, or a unit plan of development or operation' as provided for lease extensions under 43 CFR 3203.1-4(b)." *See* 43 C.F.R. §§ 3203.1-3, 3203.1-4 (1997). The California Office requested an opinion from the Department of Interior Solicitor General to resolve this difference of interpretation, but it appears that such opinion was never issued.

In July 1991, under § 1005(a), BLM continued for up to 40 additional years the one lease in the Glass Mountain Unit on which the paying-well determination had been made. Under § 1005(g), it also continued for five years the 22 other leases in the Glass Mountain Unit owned by Calpine's predecessor. In September 1991, Calpine requested five-year extensions for two other leases it held within the Glass Mountain Unit.[5] In October 1991, Calpine's predecessor requested that BLM rescind the five-year lease extensions granted in July of that year and instead grant 40-year lease continuations to all of the unproven leases within the Glass Mountain Unit pursuant to Article 17.4 of the lease agreement. BLM granted extensions for Calpine's two leases in March 1992, but declined to grant Calpine's predecessor's request for 40-year lease continuations.

In 1995, BLM found Calpine's predecessor "in default of meeting reasonable diligence in the unit," but approved the 1994/1995 plan of operation on the condition that the unit operator "will drill at least one well on a federal lease within and committed to the Glass Mountain Unit" before May 17,

---

[5] No party requested extension of two additional Glass Mountain Leases, CACA 21929 and 21933 in 1991. Presumably this is because BLM issued these leases in 1988, so their primary terms were not scheduled to end until 1998.

1996. BLM later rescinded the requirement to drill a well, but noted that the unit operator should have submitted a Participating Area designation based on the 1989 paying-well determination by February 13, 1994. Though that date had passed, BLM gave the unit operator 60 days to submit a participating area designation.[6]

In November 1996, Calpine's predecessor again requested that BLM rescind its lease extensions and retroactively grant 40-year continuations of the unproven Glass Mountain leases pursuant to Article 17.4 of the Unit Agreement. In two decision letters, BLM reversed course and granted this request on May 18, 1998. One letter vacated the 24, five-year lease extensions granted in 1991 and 1992:

> On July 18, 1991, and March 20, 1992, based upon lessee's requests, this office issued decisions granting five year extensions under 43 CFR 3203.1-4(c) to 25 geothermal leases.[7] This decision applies to the 24 leases which are currently committed to the Glass Mountain Unit . . . . However, the Glass Mountain Unit contains a well capable of production, and it has been determined through a careful review and interpretation of the regulations that the decision to grant 24 of the 25 extensions was in error.

[6] The record does not indicate whether a participating area designation was ever submitted.

[7] The 25th lease extension applied to lease CACA 11707, which is not a part of the Glass Mountain Unit and not part of this appeal.

The other letter granted 40-year continuations to the 26[8] unproven Glass Mountain leases:

> This decision affects 26 of the 27 geothermal leases currently committed to the Glass Mountain Unit and Unit Agreement . . . . One lease committed to the Unit, CACA 12372, has been determined to be capable of production, as the result of a paying well determination, effective February 13, 1989, and was granted an additional term under 43 [C.F.R. §] 3203.1-3.[9]
>
> Based upon the paying well determination and the subsequent granting of an additional term to lease CACA 12372 under 43 [C.F.R. §] 3203.1-3, all leases committed to the Glass Mountain Unit at that time should also have been granted additional terms as a result of Article 17.4 of the Glass Mountain Unit Agreement, which states:
>
> > *"Drilling and/or producing operations performed hereunder upon any tract of Unitized Lands will be accepted and deemed to be performed upon and for the benefit of each and every tract of Unitized Land."*

---

[8] This number includes the two unproven leases that were not extended in 1991 or 1992.

[9] 43 C.F.R. § 3203.1-3 implements the lease-continuation requirements of 30 U.S.C. § 1005(a) and (d).

> Therefore, based on the above, it is the Bureau of Land Management's determination that the 26 leases which are committed to the Glass Mountain Unit be granted an additional term [up to 40 years], effective February 13, 1989.

(Emphasis in original.). BLM did not explain its legal rationale for this changed statutory interpretation in either of the letters issued May 18, 1998. An internal BLM memo recommending the change reflected the agency's uncertainty regarding whether the Geothermal Steam Act and its implementing regulations required lease continuation and extension determinations to be made on a lease-by-lease basis, and noted that there was disagreement between the California and Nevada offices on this point, but it does not explain the rationale for adopting the view advanced by the Nevada office.

## IV.    Procedural History

### A. *Pit River I*

In 2002, some of the plaintiffs here, including the Pit River Tribe, filed suit challenging a separate decision made by BLM in 1998 granting five-year extensions under § 1005(g) to two leases in a different unit not at issue here. *Pit River I*, 479 F.3d at 777–78. The plaintiffs alleged that granting these extensions without conducting environmental review violated NEPA, NHPA, the Geothermal Steam Act, the National Forest Management Act, and the federal government's trust obligations to the Pit River Tribe. *Pit River Tribe v. BLM*, 306 F. Supp. 2d 929, 934 (E.D. Cal. 2004). The district court entered summary judgment in favor of BLM on all claims. *Pit River I*, 479 F.3d at 778.

On appeal, a panel of our court first considered whether Pit River had Article III standing to bring its claims. *Id.* at 778–80. BLM argued that Pit River suffered no injury in fact and that its claims regarding the 1998 lease extensions were not redressable because the 1998 lease extensions were supplanted by new extensions in 2002. *Id.* at 779. We rejected these arguments, holding that Pit River adequately demonstrated injury in fact and redressability.[10] *Id.* at 779–80. The panel then considered whether, under the 1998 version of the Geothermal Steam Act, BLM was required to conduct review under NEPA and NHPA before granting lease extensions under § 1005(g). *Id.* at 780–88. *Pit River I* observed that the 1998 version of § 1005(g) provided that geothermal leases "*may* be extended for successive 5-year periods," and concluded that the use of "may" rather than "shall" gave BLM discretion whether to grant lease extensions. *Id.* at 780 (quoting 30 U.S.C. § 1005(g)(1) (1998)). *Pit River I* held that, because the decision to grant the extensions under § 1005(g) was discretionary, and because earlier programmatic and general leasing EISs did not adequately consider the effects of geothermal development on specific leases, "[t]he agencies violated their duties under NEPA and NHPA and their fiduciary duty to the Pit River Tribe by failing to complete an environmental impact statement before extending Calpine's leases in 1998." *Id.* at 788.

On remand, the parties disputed whether the leasing process would need to begin anew, thereby necessitating a new competitive bidding process. *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1074 (9th Cir. 2010). The district court concluded that the lease extensions should not

---

[10] The court did not address prudential standing. *See id.* at 778–80.

be vacated, but remanded the case to the agencies to conduct proper NEPA and NHPA review, and to permit tribal consultation. *Id.* Pit River appealed, but we upheld the district court's order.[11] *Id.* at 1085.

## B. *Pit River II*

In 2004, while *Pit River I* was pending, the plaintiffs here filed two separate complaints challenging BLM's May 18, 1998 decisions to vacate its earlier-granted lease extensions for the 26 unproven Glass Mountain leases and to grant lease continuations instead. *Pit River Tribe v. BLM*, Case No. 04-0956 (E.D. Cal., filed May 17, 2004) and *Save Medicine Lake Coal. v. BLM*, No. 04-0969 (E.D. Cal., filed May 18, 2004). Adjudication of these cases was delayed pending the resolution of *Pit River I* and while the parties engaged in settlement negotiations. In 2012, the district court consolidated *Pit River Tribe* and *Save Medicine Lake*, and the plaintiffs agreed to file an amended complaint. Pit River stipulated that it would "only assert causes of action related to the May 18, 1998 lease extensions and to Federal Defendants' alleged failure to provide public records in response to Plaintiffs' Freedom of Information Act request."

Pit River's amended complaint alleged that BLM's 1998 decision to continue the leases violated the Geothermal Steam Act, NEPA, NHPA, and the agency's fiduciary trust obligation to Indian tribes. Pit River's Geothermal Steam Act claims, which are set out in Paragraph 107 of the amended complaint, specifically alleged:

---

[11] We reversed in part only to correct two minor errors in the district court's order. *Id.* at 1085.

Federal Defendants BLM and Department of the Interior violated the Geothermal Steam Act, 30 U.S.C. § 1001 *et seq*., and its implementing regulations in that they:

a. Unlawfully failed to terminate or eliminate the Leases from the Glass Mountain Unit Agreement when the Unit Operator failed to comply with the reasonable diligence requirements of the approved Plan of Operation in 1995, and this violation is ongoing and continues to this day;

b. Unlawfully failed to contract the Glass Mountain Unit Agreement to include only Lease CA12372 when the Unit Operator failed to submit a schedule for establishing the Participating Area for Well No. 31-17, as required by the Unit Agreement, by the fifth anniversary of BLM's determination that such well was capable of commercial production, and this violation is ongoing and continues to this day;

c. Unlawfully failed to terminate the 26 Leases identified in paragraph 1 hereof for failure to comply with the "due diligence" and "bona fide efforts" requirements of the GSA, and this violation is ongoing and continues to this day;

d. Unlawfully and retroactively continued the 26 Leases identified in paragraph 1 hereof for an additional period of 40 years in May 1998

in the absence of any commercial production, as defined by the GSA, on those Leases during the primary lease term; and

e. Unlawfully failed to ensure that activities and operations authorized by the 1998 Lease Continuation Decision for the Leases identified in paragraph 1 would protect the quality of natural, cultural, and scenic resources; accommodate other land uses; protect people and wildlife from unacceptable noise levels; and prevent undue degradation of the land.

The amended complaint also alleged that BIA violated the Freedom of Information Act (FOIA). Defendant Calpine moved for summary judgment on Pit River's FOIA claims and for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) on all other claims.

The district court granted summary judgment on Pit River's FOIA claims,[12] and entered judgment on the pleadings on the remaining claims. The court concluded that Pit River waived all of the claims alleged in Paragraph 107 of the complaint except for the claim in subparagraph (d) that BLM unlawfully continued the 26 unproven leases in May 1998. The court then concluded Pit River lacked prudential standing to bring its Paragraph 107(d) claim because Pit River did not fall within the "zone of interests" of the Geothermal Steam Act's lease-continuation provision, § 1005(a). The court dismissed Pit River's NEPA, NHPA, and fiduciary duty claims on the basis that BLM lacked

---

[12] Pit River does not appeal the dismissal of the FOIA claims.

discretion to consider environmental, cultural, or historic factors, or to consult with Indian tribes in considering whether to grant lease-continuations under § 1005(a). A pivotal conclusion in the district court's ruling was its decision that Pit River's challenge to BLM's 1998 decision rested on only the lease-continuation provision, § 1005(a).

## STANDARD OF REVIEW

This court reviews a motion for judgment on the pleadings under Rule 12(c) de novo. *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013). "Analysis under Rule 12(c) is 'substantially identical' to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (citations and internal quotation marks omitted).

## DISCUSSION

## I.  Pit River's Geothermal Steam Act Claims

Because the Geothermal Steam Act does not expressly provide for a private right of action, Pit River relied on the Administrative Procedure Act (APA) to bring its challenge to BLM's 1998 decisions to vacate its lease extension decisions and continue the 26 unproven Glass Mountain leases as a unit. Under § 10(a) of the APA "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. BLM does not dispute that Pit River has Article III standing

to bring its claims.**[13]**   In addition to Article III standing, in order to bring a cause of action under § 10(a), the interests a plaintiff asserts "must be 'arguably within the zone of interests to be protected or regulated by the statute.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).   The district court reasoned that because "[t]he statute and regulations applicable here . . . do not permit, much less require, consideration of environmental concerns or competing land uses when BLM acts on continuation of an existing lease," Pit River's interests do not fall within the statutory lease-continuation provision's "zone of interests."

## A.  The "zone of interests" test

The Supreme Court first articulated the zone-of-interests test in 1970 in *Data Processing*.  397 U.S. at 153.  The Court stated that standing "concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."  *Id.*  In 1987, the Supreme Court explained in *Clarke v. Securities Industry Association*, that:

---

**[13]** *Pit River I* establishes that the requirements of Article III standing are met here: Pit River suffered an injury in fact that is fairly traceable to BLM's conduct and that would likely be redressed by a favorable decision.  *See* 469 F.3d at 778–80 (holding that Pit River had standing to challenge BLM's extension of geothermal leases in Medicine Lake Highlands).

> The 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

479 U.S. 388, 399–400 (1987) (footnotes omitted). The zone-of-interests test should be applied consistent with Congress's intent "to make agency action presumptively reviewable" under the APA. *Match-E-Be-Nash-She-Wish*, 132 S. Ct. at 2210 (quoting *Clarke*, 479 U.S. at 399).

The Supreme Court has often characterized the zone-of-interests test as a "prudential standing" requirement. *See, e.g.*, *Fed. Election Comm'n v. Atkins*, 524 U.S. 11, 20 (1998); *Bennett v. Spear*, 520 U.S. 154, 163 (1997). But last year, in *Lexmark International, Inc. v. Static Control Components, Inc.*, the court rejected the "prudential standing" label and made clear that whether a plaintiff's claims are within a statute's zone of interests is not a jurisdictional question. 134 S. Ct. 1377, 1387–88 (2014); *see also Chaudhry v. City of L.A.*, 751 F.3d 1096, 1109 (9th Cir. 2014) ("[U]nlike

standing, 'the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction.'" (quoting *Lexmark*, 134 S. Ct. at 1387 n.4)).  The Court explained:

> Although we admittedly have placed [the zone-of-interests] test under the "prudential" rubric in the past, it does not belong there . . . . Whether a plaintiff comes within "the zone of interests" is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim.  As Judge Silberman of the D.C. Circuit recently observed "prudential standing is a misnomer" as applied to the zone-of-interests analysis, which asks whether "this particular class of persons ha[s] a right to sue under this substantive statute."

*Id.* at 1387 (citations omitted) (quoting *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675–76 (D.C. Cir. 2013) (Silberman, J., concurring)).

Because *Lexmark* addressed a claim arising under the Lanham Act rather than under § 10 of the APA, the Supreme Court did not directly revisit its APA zone-of-interests precedent. *Id.* at 1383.  But in discussing the Court's prior APA decisions, *Lexmark* reaffirmed its consistent statement "that the [zone-of-interests] test 'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed' that Congress authorized that

plaintiff to sue." *Id.* at 1389 (quoting *Match-E-Be-Nash-She-Wish*, 132 S. Ct. at 2210).

## B. Pit River's claims fall within the applicable zone of interests.

The pivotal question here is whether Congress intended to create a cause of action encompassing Pit River's claims when it enacted the Geothermal Steam Act. *See id.* at 1387. The parties dispute whether the court may look to the Geothermal Steam Act's overall statutory scheme to determine whether Pit River's claims fall within the Act's zone of interests, but *Bennett v. Spear* clearly answered this question. *Bennett* held, "[w]hether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . . , but by reference to the particular provision of law upon which the plaintiff relies." 520 U.S. at 175–76 (first two alterations in original) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). We agree with the district court that, contrary to Pit River's argument, Pit River's ability to challenge the subject leases cannot be determined by looking to the broad objectives of the Geothermal Steam Act. But we do not agree that Pit River's claims can be fairly described as arising only from § 1005(a).

In 2012, when Pit River's two cases were consolidated into one, Pit River stipulated that it would "only assert causes of action related to the May 18, 1998 lease extensions" in its amended complaint. At the hearing on BLM's and Calpine's motions for judgment on the pleadings, Pit River explained that the amended complaint's allegations regarding inclusion of the unproven leases within the Glass Mountain Unit were

pleaded only as facts, not as distinct legal challenges. The district court interpreted this explanation as meaning that Pit River waived all of its Geothermal Steam Act claims except those in Paragraph 107(d) of the amended complaint, which alleged BLM "[u]nlawfully and retroactively continued the 26 Leases . . . for an additional period of 40 years in May 1998 in the absence of any commercial production." The district court concluded that Pit River's remaining Geothermal Steam Act claim relied on only the Act's lease-*continuation* provision, § 1005(a). But neither the stipulation nor the amended complaint expressly limited Pit River's claims to any particular provision of the Geothermal Steam Act, and Pit River never limited its claims only to § 1005(a). The transcript from the hearing on the motion for judgment on the pleadings makes this clear.

First, the district court inquired about the nature of the claims in Pit River's amended complaint. Pit River's counsel stated that Pit River was not merely challenging BLM's lease continuation decision under § 1005(a), but was also challenging BLM's decision to reverse course and decide that the leases could be continued under § 1005(a) as a unit rather than being subject to lease-by-lease extensions under § 1005(g). As counsel explained:

> Our view is twofold. One is a legal issue and one is a factual issue. First of all, on the legal issue, . . . BLM had taken the position the leases were not under this mandatory extension but under a discretionary extension and then changed [its] mind[].

. . .

[A]t the time the decisions were made, there was a provision, 1005(g), that allowed for these five-year extensions, and that's, in fact what the BLM believed it was originally extending these leases under. . . .

. . .

So the first question is whether they were properly under 1005(a) or 1005(g) as it existed at the time . . . . *[W]e believe that decision whether to renew under § 1005(a) or 1005(g) is a challengeable decision.* But even if we were under Section 1005(a), . . . the agency has to find that geothermal steam is produced or utilized in commercial quantities.

(Emphasis added.).

The district court acknowledged this argument, asking BLM's counsel: "Why don't the plaintiffs have a right to challenge that determination? That's the legal question she says exists now. I grant your motion if 1005(a) applies. If 1005(g) applies, that presents different issues and problems for you." After BLM responded that it was "precisely the application of 1005(a) that the plaintiffs challenge here," the district court pressed further:

How do they challenge then the decision of BLM then to . . . , as [Pit River's counsel] argues, at one point BLM is proceeding under 1005(g) and then a second opinion comes out and says: No, no. 1005(a) applies. Why don't they have a right to challenge that decision?

> If they disagree, someone should have a right
> to challenge it, shouldn't they?

BLM's counsel's answer was not especially responsive:

> Not necessarily.  It is not necessarily the case
> that any party has standing to challenge a
> particular administrative action.  That is the
> Doctrine of Standing.  Because they lack
> standing, the question: How do they challenge
> it just doesn't arise. They don't.  They cannot
> challenge a decision under that provision of
> the statute.

The district court concluded that Pit River had actually abandoned its challenge to BLM's decision to apply § 1005(a) rather than §1005(g).  The court said to Pit River's counsel:

> You're arguing to me, again, the evidence is
> going to show that they didn't qualify, that the
> secretary or the solicitor or whoever makes
> the decision, that the leases should be
> extended got it completely wrong.  Again, as
> I understand the government's response to
> that is: Too late. It doesn't matter. You've
> abandoned those claims. You should have
> challenged those, that decision earlier. Again,
> it comes back to me—there's two decisions
> here:  Were those conditions actually met?
> Second, do we have to grant the lease
> extensions?  This lawsuit is only about: Were
> the lease extensions legal?  And so, again, I'm
> having a hard time getting past how we started

this argument, which is, none of that is relevant.

But Pit River did not concede that it had abandoned its challenge to BLM's May 18, 1998 change of course; instead, it made clear, as it stated in the district court hearing, that it thought "the court needs to look at what was done here in order to determine whether the BLM's last-minute reversal to make this a ministerial, rather than a discretionary decision, was proper under the law." Additionally, contrary to the district court's suggestion, Pit River could not have challenged the decision earlier because it appears that BLM first communicated its changed interpretation of § 1005 and the implementing regulations when it issued the 1998 letter retroactively continuing the unproven Glass Mountain leases.

Pit River's challenge plainly included whether BLM lawfully vacated its earlier § 1005(g) extension decisions and changed its interpretation of § 1005 to continue the leases for up to 40 years. Because Pit River's operative complaint challenges BLM's announcement that the leases were subject to continuation rather than extension, we conclude that Pit River's claims include a challenge under § 1005(g). *Pit River I* held that BLM must conduct NEPA and NHPA review before granting discretionary extensions under the 1998 version of §1005(g).[14]  469 F.3d at 788.

---

[14] Amendments to the Geothermal Steam Act in 2005 eliminated BLM's discretion to consider environmental and cultural factors in making lease-extension decisions under § 1005(g). *Pit River I*, 469 F.3d at 780. Thus, if Calpine elected to have its leases subject to the updated regulations, *see* 43 C.F.R. § 3200.7 (2007), future extensions of these leases may not be subject to NEPA or NHPA review. *Id.*

## II. The merits of Pit River's Geothermal Steam Act claims

Pit River argues it is entitled to judgment on the merits of its Geothermal Steam Act claims, in particular its claim that BLM improperly continued other leases within the Glass Mountain Unit rather than addressing the leases within the Unit one-by-one to determine whether extensions of those leases should be granted. Pit River asks our court to remand to the district court with instructions to enter judgment in its favor. We decline to do so. The district court did not consider the merits of Pit River's Geothermal Steam Act claims, and determining whether BLM violated provisions of the Geothermal Steam Act will require careful analysis. The district court should undertake that task in the first instance. *See, e.g.*, *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1021 (9th Cir. 2012) (directing district court to examine in the first instance issues not previously reached that might require factual development). Moreover, under Federal Rule of Civil Procedure 12(c), a plaintiff is not entitled to judgment on the pleadings if the defendant's answer raises issues of fact or affirmative defenses. *Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventists Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989). In this case, the defendants' answers do both. We therefore decline Pit River's invitation to rule on the merits of its Geothermal Steam Act claims.

## III.    Pit River's NEPA, NHPA, and Fiduciary Duty Claims

The district court concluded that Pit River's NEPA, NHPA, and fiduciary duty claims failed because § 1005(a) is non-discretionary—BLM is not permitted to consider

environmental factors in making lease continuation decisions and any environmental review would be superfluous. We agree with the district court that § 1005(a) is non-discretionary, *see Pit River I*, 469 F.3d at 780 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004)), but, as discussed, the district court incorrectly circumscribed Pit River's claims. If Pit River prevails on its claim that the leases here were eligible only for extension under § 1005(g), BLM will be required to comply with NEPA and NHPA, including by consulting with affected tribes. *Id.* at 787–88. Therefore the district court erred by granting judgment on the pleadings on Pit River's NEPA, NHPA, and fiduciary duty claims.

## CONCLUSION

We **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.