FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PIT RIVER TRIBE; NATIVE
COALITION FOR MEDICINE
LAKE HIGHLANDS DEFENSE;
MOUNT SHASTA
BIOREGIONAL ECOLOGY
CENTER; SAVE MEDICINE
LAKE COALITION; MEDICINE
LAKE CITIZENS FOR QUALITY
ENVIRONMENT,
     *Plaintiffs-Appellees*,

v.

BUREAU OF LAND
MANAGEMENT; U.S.
DEPARTMENT OF THE
INTERIOR,
     *Defendants-Appellants*.

No. 17-15616

D.C. Nos.
2:04-cv-00956-JAM-AC
2:04-cv-00969-JAM-AC

OPINION

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted May 14, 2019
Seattle, Washington

Filed September 19, 2019

Before:  William A. Fletcher and Morgan Christen, Circuit Judges, and Roslyn O. Silver,[*] District Judge.

Opinion by Judge Christen

---

## SUMMARY[**]

---

### Geothermal Steam Act  / Federal Leases

The panel affirmed the district court's summary judgment in favor of Pit River Tribe and several environmental organizations in their action against federal agencies responsible for administering twenty-six unproven geothermal leases located in California's Medicine Lake Highlands.

Pit River alleged that the Bureau of Land Management's decision to continue the terms of the unproven leases for up to forty years violated the Geothermal Steam Act ("GSA").

Section 1017 of the GSA authorizes the Secretary of the Interior to approve cooperative or unit plans to manage multiple geothermal leases as a unit, and the Secretary must review such unit plans every five years and eliminate any lease not reasonably necessary for unit operations under the plan.  Section 1005(a) of the GSA provides that geothermal

---

[*] The Honorable Roslyn O. Silver, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

leases on federal land have primary lease terms of ten years, and allows the leases to be continued for as long as geothermal steam is produced in commercial quantities. Section 1005(c) states that leases subject to "unit plans" may be extended even if not productive during the initial ten-year term under certain conditions.

The panel held that the statutory meaning of 30 U.S.C. § 1005(a) was clear and unambiguous. The panel held that the provision permitted production-based forty-year continuations at the end of the primary term only on a lease-by-lease basis, not on a unit-wide basis. It was BLM's burden to provide a compelling reason for the court to depart from the plain language of § 1005(a), and the panel concluded that it had not met that burden here.

---

**COUNSEL**

Mary Gabrielle Sprague (argued) and Ellen J. Durkee, Appellate Section; Eric Grant, Deputy Assistant Attorney General; Jeffrey Bossert Clark, Acting Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Samuel Lazerwitz (argued) and Caleb G. Wright (argued), Certified Law Students; Alicia E. Thesing, Isaac C. Cheng, and Deborah Ann Sivas, Supervising Attorneys; Environmental Law Clinic, Mills Legal Clinic at Stanford Law School, Stanford, California; for Plaintiffs-Appellees.

## OPINION

CHRISTEN, Circuit Judge:

The Bureau of Land Management and the Department of the Interior (collectively, BLM) appeal the district court's order granting summary judgment in favor of the Pit River Tribe and several local and regional environmental organizations (collectively, Pit River). We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm the district court's judgment.

## I. Background

Pit River filed this action against the federal agencies responsible for administering twenty-six unproven geothermal leases located in California's Medicine Lake Highlands. We refer to these leases as "unproven" because BLM has not determined that they are capable of producing geothermal steam in commercial quantities. *See Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1149–50 (9th Cir. 2015) (*Pit River III*).[1] Calpine Corporation, the current leaseholder, was also named as a defendant but it did not appeal the judgment the district court entered on remand from our court. The operative complaint alleges that BLM's decision to continue the terms of the unproven leases for up to forty years violated the Geothermal Steam Act (GSA), the National Environmental Policy Act (NEPA), the National

---

[1] Our decision in *Pit River III* provides a detailed history of the case. We recount that history only as necessary to resolve this appeal.

Historic Preservation Act (NHPA), and the Indian-fiduciary-trust doctrine.[2] *Id.* at 1148.

The subject leases are located within the Glass Mountain Unit Plan. The parties agree that the GSA requires that any lease be allowed to continue if it is producing geothermal steam in commercial quantities, or is shown to be capable of doing so, within its primary ten-year term. *See* 30 U.S.C. § 1005(a) (1994).[3] The parties' dispute centers on whether all leases committed to a "unit plan" may be collectively continued for up to forty years if any single lease in the unit becomes productive during the primary term. Pit River argues that § 1005(a) allows production-based continuations to be granted only on an individual basis. BLM argues that § 1005(a) allows production-based continuations to be granted to all leases in a unit if any one of them becomes productive during the primary term. BLM's interpretation of the GSA is heavily informed by its view that the Mineral Leasing Act (MLA), 30 U.S.C. §§ 221i–236a (1964), provides an important backdrop against which the GSA must be analyzed.[4]

---

[2] The complaint also alleges a violation of the Freedom of Information Act (FOIA), but the district court's ruling on the FOIA issue was not appealed.

[3] Unless otherwise specified, all citations to the GSA refer to the 1994 edition of the United States Code because the parties agree that this iteration of the GSA applies to their dispute.

[4] Unless otherwise noted, all citations to the MLA's provisions are to the 1964 edition of the United States Code, which was in effect when the GSA was enacted.

## II. Procedural History

This is the second time our court has addressed the controversy concerning the duration of the leases in the Glass Mountain Unit. *See Pit River III*, 793 F.3d at 1148. In July of 2013, the district court granted judgment on the pleadings in favor of BLM on the grounds that Pit River lacked prudential standing to assert its GSA claim. *Id.* at 1154–55. We reversed the district court's judgment, ruling that Pit River's claim fell within the GSA's "zone of interests," *id.* at 1155–58, and we remanded to the district court so it could consider the merits of the claims.

On remand from *Pit River III*, the district court granted summary judgment in favor of Pit River. The court ruled that, as it was written in 1994, the GSA's primary term provision was unambiguous and did not authorize BLM to continue the twenty-six unproven leases for forty years simply because they were part of a unit that contained a single proven lease. The district court reasoned that because Congress referred to "unit plans" in § 1005(c) and (g), but omitted this term from § 1005(a), "Congress did not contemplate the additional [forty]-year term for nonproductive leases committed to a unit plan under [§] 1005(a)." In an amended judgment, the district court vacated and set aside BLM's May 18, 1998 decision granting the lease continuations, and remanded the proceedings to the agency to determine whether to extend or cancel the twenty-six leases pursuant to the GSA and the implementing regulations in effect as of May 1998. The district court observed that its judgment did not affect BLM's decision to continue the single proven lease, and that Pit River's NEPA, NHPA, and fiduciary duty claims were mooted by the court's

vacatur of BLM's 1998 decision letters.  BLM appeals the district court's judgment.

### III.  Standard of Review

We review de novo an order granting summary judgment. *Cty. of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1020 (9th Cir. 2017).

### IV.  Jurisdiction

We must first assure ourselves of our jurisdiction to hear this appeal because the district court's order granting summary judgment vacated BLM's 1998 decision letters and remanded to the agency.  *See Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1075 (9th Cir. 2010).  "[R]emand orders are generally not 'final' decisions for purposes of section 1291[,]" *id.*, but a remand order is considered final and appealable where: "(1) the district court conclusively resolves a separable legal issue, (2) the remand order forces the agency to apply a potentially erroneous rule which may result in a wasted proceeding, and (3) review would, as a practical matter, be foreclosed if an immediate appeal were unavailable."  *Id.* (quoting *Alsea Valley All. v. Dep't of Commerce*, 358 F.3d 1181, 1184 (9th Cir. 2004)).  Here, because the district court determined that 30 U.S.C. § 1005(a) did not authorize BLM to continue the unproven leases based on the single proven lease, BLM will be constrained by this interpretation on remand.  If the district court's interpretation is incorrect, the remand will result in a wasted proceeding. Moreover, review of the district court's interpretation will be foreclosed absent immediate appeal because, after remand to the agency, BLM cannot later appeal the result of its own agency decision.  *See Alsea Valley All.*, 358 F.3d at 1184;

*Chugach Alaska Corp. v. Lujan*, 915 F.2d 454, 457 (9th Cir. 1990).   For these reasons, we conclude that we have jurisdiction to hear this appeal.

## V.  Discussion

### A.  The Geothermal Steam Act

This appeal requires us to interpret the GSA, 30 U.S.C. §§ 1001–1028 (1994).  Congress enacted the GSA in 1970 "to promote the development of geothermal leases on federal lands." *Geo-Energy Partners-1983 Ltd. v. Salazar*, 613 F.3d 946, 949 (9th Cir. 2010).  Geothermal resources include "the heat or energy found in steam, hot water, or geothermal formations." *Id.*  The GSA was adopted in the wake of the MLA, which governs oil and gas leases on federal lands. *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 87 (2006).  A brief explanation of the MLA's unitization provision provides helpful background.

When Congress enacted the MLA, oil and gas were extracted under the common-law "rule of capture," which encouraged landowners to drill wells on individual leases to capture as much oil or gas as possible. *See* Frank Sylvester & Robert W. Malmsheimer, *Oil and Gas Spacing and Forced Pooling Requirements: How States Balance Energy Development and Landowner Rights*, 40 U. Dayton L. Rev. 47, 49 (2015).  The rule of capture encouraged overdrilling that dissipated reservoir pressure and ultimately led to inefficient oil and gas recovery. *See* Northcutt Ely, *The Conservation of Oil*, 51 Harv. L. Rev. 1209, 1219–22 (1938). The practice of unitization emerged in response to these inefficiencies. *See* Sylvester, et al., *supra* at 49–50. Unitization allows an entire oil or gas field "to be operated as

a single entity, without regard to surface boundary issues," *see Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1438 (9th Cir. 1990) (internal quotation marks omitted), i.e., it allows drilling and production operations occurring on a single lease within a unit to be deemed performed on all other leases within the unit for purposes of showing that bona fide development efforts have been made, or for sharing royalties. *See, e.g.*, 30 U.S.C. § 1017; 30 U.S.C. § 226(j); 43 C.F.R. §§ 3280–3287 (1997). By limiting the need to drill on each lease within a unit, unitization lessens the likelihood that an oil or gas reservoir will suffer from overdrilling and depleted reservoir pressure. Congress incorporated the unitization concept into the MLA, granting the Secretary of the Interior the authority to approve unit plans of development when doing so is in the public interest. *See* Pub. L. No. 71-853, 46 Stat. 1523. Although significant differences exist between the MLA and the GSA, the GSA also permits lessees to join together under unit plans of development. *See* 30 U.S.C. § 1017; 43 C.F.R. § 3280.0–2 (1997).

The GSA refers to production-based "continuations" and drilling-based "extensions"—concepts articulated in the MLA—but neither the MLA nor the GSA explicitly define these terms. *See* 30 U.S.C. §§ 221i–236a; 30 U.S.C. § 1001. The parties agreed at oral argument that, like the MLA, the GSA allows for lease *continuations* based on production, and lease *extensions* based on exploratory drilling activities.**[5]**

---

**[5]** We note that the Interior Board of Land Appeals generally interprets a continuation based on production as a prolonged lease term that is "indefinite and is allowed when a lease is presently capable of producing oil or gas" in commercial quantities, while an "'extension by drilling' . . . requires that a lessee conduct actual drilling operations on the last day of

Pit River's claims implicate §§ 1005 and 1017 of the GSA, so we discuss these provisions in some detail. Section 1017 governs unit plans. Section 1005 governs the duration of geothermal lease terms.

### 1.  30 U.S.C. § 1017:  The Unitization Provision

Section 1017 of the GSA authorizes the Secretary of the Interior to approve cooperative or unit plans to manage multiple leases as a unit "[f]or the purpose of properly conserving the natural resources of any geothermal pool, field, or like area." 30 U.S.C. § 1017. The Secretary must review such unit plans every five years "and, after notice and opportunity for comment, eliminate from inclusion in such plan any lease or part of a lease not regarded as reasonably necessary to cooperative or unit operations under the plan." *Pit River III*, 793 F.3d at 1150 (quoting 30 U.S.C. § 1017).

### 2.  30 U.S.C. § 1005:  The Lease Duration Provisions

Section 1005(a) of the GSA provides that geothermal leases on federal land have primary lease terms of ten years. 30 U.S.C. § 1005(a). If geothermal steam is produced in commercial quantities during the ten-year primary term, § 1005(a) allows the lease to be continued for as long as geothermal steam is produced in commercial quantities, not

---

the lease term with an intent to complete a producing well." *Coastal Petroleum Co.*, 190 IBLA 347, 352, 2017 WL 3263839, at *4 (July 25, 2017).

to exceed an additional forty years.**[6]** *Id.* At the end of the first forty-year term granted pursuant to § 1005(a), the GSA affords a preferential right of renewal for a second forty-year term if geothermal steam is still being produced in commercial quantities and the land is not needed for other purposes. 30 U.S.C. § 1005(b).

Neither § 1005(a) nor § 1005(b) refer to "unit plans," but § 1005(c) does. It is entitled "Cooperative or unit plan for drilling operations; extension of term; renewal." 30 U.S.C. § 1005(c). Section 1005(c) states that leases subject to unit plans may be extended, even if the leases have not been productive during their initial ten-year primary terms, if actual drilling operations begin prior to the end of the primary lease terms and are being diligently prosecuted.**[7]** *Id.* For leases still not producing steam nor shown to be capable of producing in commercial quantities by the end of an extension granted pursuant to § 1005(c), the agency may

---

**[6]** 30 U.S.C. § 1005(a) specifies that "[i]f geothermal steam is produced or utilized in commercial quantities within this term, such lease shall continue for so long thereafter as geothermal steam is produced or utilized in commercial quantities, but such continuation shall not exceed an additional forty years." In turn, 30 U.S.C. § 1005(d) defines "produced or utilized in commercial quantities" to include a showing that a well is "*capable* of producing geothermal steam in commercial quantities." (emphasis added).

**[7]** 30 U.S.C. § 1005(c) provides, *inter alia*, that a lease for which:

> actual drilling operations were commenced prior to the end of its primary term and are being diligently prosecuted at that time shall be extended for five years and so long thereafter, but not more than thirty-five years, as geothermal steam is produced or utilized in commercial quantities.

authorize one or two additional five-year extensions if the lessee has made certain bona fide efforts.**[8]**    30 U.S.C. § 1005(g)(1).  Notably, § 1005(g)(1) also expressly refers to leases operated under "approved cooperative or unit plan[s] of development."    *Id.*    If a lease extended pursuant to § 1005(g)(1) begins producing geothermal steam in commercial quantities during a § 1005(g)(1) extension, § 1005(g)(2) provides that the lease shall be continued for up to twenty-five additional years if it was previously extended under § 1005(c), "for a total of [fifty] years," or for up to thirty additional years (but not to exceed a total of fifty years)

---

**[8]** 30 U.S.C. § 1005(g)(1) states:

> (1) Any geothermal lease issued pursuant to this chapter for land on which, or for which under an approved cooperative or unit plan of development or operation, geothermal steam has not been produced or utilized in commercial quantities by the end of its primary term, or by the end of any extension provided by subsection (c) of this section, may be extended for successive 5-year periods, but totaling not more than 10 years, if the Secretary determines that the lessee has met the bona fide effort requirement of subsection (h) of this section, and either of the following:

> > (A) [T]he payment in lieu of commercial quantities production requirement of subsection (i) of this section.

> > (B) The significant expenditure requirement of subsection (j) of this section.

if it was only previously extended pursuant to § 1005(g)(1).[9]
30 U.S.C. § 1005(g)(2).

## B.  The Glass Mountain Leases

Three years after Congress enacted the GSA, BLM
promulgated regulations authorizing holders of geothermal
leases to enter into unit agreements for the development of
geothermal resources.  *See* 38 Fed. Reg. 35,068, 35,073–75
(Dec. 21, 1973); *see also* 43 C.F.R. §§ 3280.0–1 to 3286.1
(1997).  These regulations included a model unit agreement.
*See* 38 Fed. Reg. at 35,075–80; *see also* 43 C.F.R. § 3286.1
(1997).   In 1982, Calpine's predecessors entered into the
Glass Mountain Unit Agreement, which tracked the
regulations' model agreement.[10]

The twenty-six unproven leases at issue in this
appeal—plus a twenty-seventh "proven lease" that BLM
determined was capable of producing geothermal steam in
commercial quantities—were eventually committed to the
Glass Mountain Unit Agreement.  *Pit River III*, 793 F.3d
at 1149–51.  The Agreement established a "Unit Area" and

---

[9] 30 U.S.C. § 1005(g)(2) provides:

> (2) A lease extended pursuant to paragraph (1) shall
> continue so long thereafter as geothermal steam is
> produced or utilized in commercial quantities, but such
> continuation shall not exceed an additional 25 years, for
> a total of 50 years, if such lease was also the subject of
> an extension under subsection (c) of this section or an
> additional 30 years, for a total of 50 years, if such lease
> is only extended pursuant to paragraph (1).

[10] We do not separately identify Calpine's predecessors to avoid
confusion and because the predecessors' actions do not affect our analysis.

"Participating Area." The Unit Area is the area comprised of all leases subject to the Agreement, and the Participating Area is the "part of the Unit Area which is deemed to be productive," i.e., it is "all land then regarded as reasonably proved to be productive from a pool or deposit discovered or developed[.]" By the fifth anniversary of the Participating Area's effective date, the Agreement requires that all portions of unitized lands not entitled to be included in the Participating Area must be automatically eliminated from the Agreement and from the Unit Area, unless drilling operations are in progress on an exploratory well and these operations continue diligently.

In 1989, BLM determined that a single lease in the Glass Mountain Unit was capable of producing geothermal steam in commercial quantities. *Pit River III*, 793 F.3d at 1151. In 1991 and 1992, at the request of Calpine's predecessors, BLM's California State Office extended the terms of twenty-four unproven leases in the Glass Mountain Unit for five years pursuant to § 1005(g)(1). BLM continued the term of the single proven lease for up to forty additional years pursuant to § 1005(a). *Id.* In the process of responding to the predecessors' requests, BLM's California State Office communicated with the Nevada State Office, "which advised that [forty]-year lease continuations should be granted to all of the unproven Glass Mountain leases[.]" *Id.* The California Office disagreed. *Id.* It concluded that "the '[forty-]year extension [under § 1005(a)] may only be applied to the lease with the well capable of production and not to the other committed leases in the unit.'" *Id.* (second alteration in original). The California Office noted that § 1005(a) did not refer to unit plans. *Id.*

In 1995, BLM sent Calpine's predecessor a letter stating that the predecessor was "in default of meeting reasonable diligence in the unit," and that the Glass Mountain Unit was "no longer of any significant benefit to the BLM or Forest Service" because "[t]he unit has become an impediment to development by causing operators to select drilling targets on the basis of whether a lease is or is not committed to the unit instead of the area with the greatest potential to support a development project." On June 3, 1996, BLM notified Calpine's predecessor via an additional letter that a proposed Participating Area should have been submitted in 1989, but that due to agency delay and other circumstances, BLM would allow submission of a proposed Participating Area within sixty days of receipt of the letter. Calpine's predecessor submitted a proposed Participating Area on August 15, 1996.[11]

BLM's California State Office changed its interpretation of § 1005(a) in 1998. The California Office's Program Lead, Sean Hagerty, circulated an internal memo that sheds light on the reasons for BLM's changed position. Hagerty's memo described the prior disagreement between BLM's California and Nevada Offices and explained that the California Office was concerned about allowing the Glass Mountain Unit to continue for an indefinite period of time merely based on the single proven lease. In particular, "BLM was concerned over how the Unit could be managed without any effective way of requiring the unit operator . . . to conduct additional activities in the Unit prior to the submission of the initial Participating Area (PA)." The memo explained that BLM was initially uncertain whether the single proven lease, which was deemed

---

[11] This information was not part of the record in *Pit River III*, 793 F.3d at 1152 n.6.

capable of production but had not actually commenced production, was legally sufficient to require Calpine's predecessor to submit an initial Participating Area. Because BLM subsequently decided that a well capable of production was equivalent to a well actually in production, it requested and received a proposed Participating Area from Calpine's predecessor. Hagerty's memo concluded that, because the Participating Area had been designated, "the Glass Mountain Unit boundary would contract down to the boundary of the [Participating Area]," and therefore "the Glass Mountain Unit Agreement no longer had an indefinite lifespan and could now be managed in the public interest." Hagerty recommended that BLM grant an additional term of up to forty years to all leases committed to the Glass Mountain Unit.

On May 18, 1998—five days after Hagerty circulated his memo—BLM's California Office issued decision letters vacating the 1991 and 1992 lease extensions for the unproven leases and continuing them for up to forty years pursuant to § 1005(a).[12] *Pit River III*, 793 F.3d at 1152. BLM explained that the decision to grant the five-year lease extensions pursuant to the regulation implementing § 1005(g)(1) "was in error." BLM further explained that all leases committed to the Glass Mountain Unit should have been granted additional lease terms based on the paying-well determination for the single proven lease pursuant to the regulation implementing § 1005(a) and (d).

---

[12] In total, BLM continued twenty-six unproven leases, which included two leases that were not previously extended in 1991 or 1992. *Pit River III*, 793 F.3d at 1152 n.8.

## C. Statutory Analysis

It is clear that the GSA authorizes "continuations" based on production, *see* 30 U.S.C. § 1005(a), and there is no dispute that the GSA authorizes five-year "extensions" based on actual drilling or bona fide efforts. *See* § 1005(c), (g). Both parties argue that 30 U.S.C. § 1005(a) is clear and unambiguous, but they advocate for opposite interpretations. BLM argues that § 1005(a), read in light of the GSA as a whole and against the backdrop of the MLA, authorizes forty-year continuations on a unit-wide basis once a single lease in a unit is deemed productive. Pit River argues that § 1005(a) unambiguously authorizes forty-year continuations at the end of a primary term only on a lease-by-lease basis, not on a unitized basis.

"We interpret a federal statute by ascertaining the intent of Congress and by giving effect to its legislative will[,]" beginning with the statute's language. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 720 (9th Cir. 2003) (internal quotation marks omitted). We "presume that [the] legislature says in a statute what it means and means in a statute what it says." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal quotation marks omitted). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Geo-Energy Partners-1983 Ltd.*, 613 F.3d at 956 (internal quotation marks omitted). If "the language is not dispositive, we look to the congressional intent revealed in the history and purposes of the statutory scheme." *Artichoke Joe's*, 353 F.3d at 720 (internal quotation marks omitted). "[I]f we find that the statutory meaning is plain and unambiguous, then our 'sole

function . . . is to enforce it according to its terms.'" *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1072 (9th Cir. 2016) (alteration in original) (quoting *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989)); *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

We begin with the GSA's text, and observe that § 1005(a) does not include the term "unit plan." *See* 30 U.S.C. § 1005(a). It is not our practice to read words into statutory provisions, *see United States v. Watkins*, 278 F.3d 961, 965 (9th Cir. 2002), as a statute's plain language is "our primary guide to Congress' preferred policy." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1678 (2017) (internal quotation marks omitted). Relatedly, we have observed that:

> It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words. Congress's explicit decision to use one word over another in drafting a statute is material. It is a decision that is imbued with legal significance and should not be presumed to be random or devoid of meaning.

*SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) (internal citations omitted). "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (internal quotation marks omitted). We conclude that the use of "unit plan" in § 1005(c) and (g)(1) expressly memorialized congressional intent to make short lease extensions available on a unit-wide basis if leases do not become productive during their primary terms but lease operators can show that drilling has commenced or other bona fide efforts have been made. In other words, we conclude that the omission of the term "unit plan" in § 1005(a) is "imbued with legal significance." *McCarthy*, 322 F.3d at 656.

BLM argues that Congress's omission of the term "unit plan" from § 1005(a) is not a rejection of the unitization principle because the subsection must be read in conjunction with the GSA as a whole and against the historical backdrop of the MLA. This argument is premised on BLM's unstated assertion that geothermal steam reservoirs function in the same way that underground pools of oil and gas do. Prior to oral argument, the record contained no support for this assertion. After oral argument, BLM submitted a letter explaining that overdrilling in geothermal fields results in a loss of well pressure, just like oil and gas fields. As support, BLM's letter cited a public document that reported on the rapid development of a northern California hydrothermal system and the resulting loss of production well pressure. Pit River has not had a chance to respond, but even assuming that geothermal reservoirs function the same way as oil and gas reservoirs do, the general framework Congress adopted in the MLA does not overcome the plain language Congress chose for the GSA's primary term and unitization provisions.

BLM argues that the MLA provides important context and that the incorporation of the unitization principle into the MLA suggests Congress intended to adopt the same statutory scheme for the GSA. We disagree. Congress enacted the MLA decades before it enacted the GSA, and we assume Congress is knowledgeable about existing law when it enacts new legislation. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990); *see also Cty. of Amador*, 872 F.3d at 1022 ("[U]nderstanding the historical context in which a statute was passed can help to elucidate the statute's purpose and the meaning of statutory terms and phrases."). The GSA's sponsor understood the 1970 bill to generally permit the Secretary of Interior to lease public lands in "much the same manner" as the Secretary was authorized to do by the MLA. S. Rep. No. 91-1160, at 4 (1970). But Congress recognized that efforts to harness geothermal steam in an emerging market posed unique challenges. *See* H.R. Rep. No. 91-1544, at 3–4 (1970). By 1970, the MLA was in its fiftieth year of regulating oil and gas leasing but the geothermal steam industry was still in its infancy. Congress acknowledged that the mining and mineral leasing statutes "lack many of the requirements necessary to encourage [geothermal steam's] orderly development." *Id.* at 5. The hope was that the GSA would "establish a framework that will make this risk-laden, relatively untried industry an attractive investment in the public interest." S. Rep. No. 91-1160, at 9. Recognizing the need to encourage geothermal exploration by allowing leaseholders time to get the resource to market—or to bring the market to the geothermal steam by building infrastructure—the GSA's original sponsor acknowledged "there may be some reasonable delay beyond the expiration of the primary term before a generating facility can be installed to receive the steam and commence actual power

production."**13** S. Rep. No. 91-1160, at 8. Contrary to BLM's argument, the text of the GSA, read as a whole, demonstrates that Congress deviated from the MLA when it adopted the GSA, perhaps because it was aware of the need to accommodate the uniquely-situated geothermal steam technology and developing market.

A comparison of the GSA's primary term provision, § 1005(a), and the MLA's primary term provision, 30 U.S.C. § 226(e), reveals notable differences. Section 226(e) is entitled "Primary terms" and it expressly incorporates the phrase "unit plan." Section 226(e) governs primary lease term continuations *and* extensions thereafter. Congress did not adopt § 226(e) wholesale when it enacted the GSA; rather, it split this provision into two subsections. Section 1005(a) authorizes primary term continuations and § 1005(c) separately authorizes post-primary term extensions and production-based continuations. BLM describes the decision to divide § 226(e) into § 1005(a) and (c) in the GSA as a stylistic choice, but we are mindful that Congress could have replicated the MLA's primary term provision (including the "unit plan" language) directly into the statutory text of GSA § 1005(a), and it did not do so.

BLM goes on to argue that the GSA provision authorizing unit plans, 30 U.S.C. § 1017, authorizes § 1005(a)'s production-based continuations to be granted on a unit-wide

---

**13** Indeed, even as of 1988, Congress acknowledged the challenges involved in harnessing geothermal energy. H.R. Rep. No. 100-664, at 6 (1988) ("Unlike coal, oil and gas which can be transported to power production facilities, the steam from a geothermal well cannot be transported more than two miles because of heat dissipation," and must be converted to electricity at or near the well site.).

basis because § 1017 is fairly read to broadly incorporate the MLA's unitization framework into the GSA. We are not persuaded that so much can be read into § 1017. First, BLM's reasoning "would require us to assume that Congress chose a surprisingly indirect route to convey an important and easily expressed message." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 262 (1994). *See generally Zachary v. Cal. Bank & Tr.*, 811 F.3d 1191, 1198–99 (9th Cir. 2016) (rejecting statutory reading that reflected a policy choice Congress could have made "in a far more straightforward manner"). Section 1017 authorizes unit agreements and constriction of unit plans, requiring that, no more than five years after approval of a unit plan (and at least every five years thereafter), the Secretary of the Interior must eliminate leases "not regarded as reasonably necessary to . . . unit operations."[14] 30 U.S.C. § 1017. Section 1017 further provides that leases eliminated from a unit by the constriction process may receive extensions pursuant to § 1005(c) and (g) only if they separately qualify.[15] *Id.* The language in § 1017 represents a significant departure from the MLA's corollary provision governing unit plans, MLA § 226(j). The MLA allows lessees to form unit plans for development, but it expressly allows leases to be continued indefinitely on a unit-wide basis—for *as long as* production continues. *See* 30 U.S.C. § 226(j). Setting aside renewals authorized by

---

[14] Section 1017 also provides that this "elimination shall be based on scientific evidence, and shall occur only when it is determined by the Secretary to be for the purpose of conserving and properly managing the geothermal resource."

[15] BLM argues that this language reaffirms the unitization principle. But the impact of this language is limited. It merely confirms that leases constricted from a unit plan must individually qualify for extensions under § 1005(c) or (g); it says nothing about continuations under § 1005(a).

§ 1005(b) and (g)(3), all GSA lease terms are capped at fifty years. The MLA also differs from the GSA by not requiring plan review every five years for constriction of the unit plan. *See id*. In sum, we agree that the MLA provides context for considering the terms of the GSA, but it cannot be doubted that Congress varied from the MLA when it fashioned §§ 1005 and 1017, and the MLA's unitization framework does not require the conclusion BLM urges us to reach.

BLM next argues that the following language in § 1005(g)(1) demonstrates that § 1005(a) authorizes continuations on a unit-wide basis:

> Any geothermal lease issued pursuant to this chapter for land on which, or for which under an approved cooperative or unit plan of development or operation, geothermal steam has not been produced or utilized in commercial quantities by the end of its primary term, or by the end of any extension provided by subsection (c) . . . may be extended for successive 5-year periods[.]

§ 1005(g)(1). Congress added this provision in 1988 to help non-productive leases withstand adverse market conditions created by a world energy glut. *See* H.R. Rep. No. 100-664, at 6 (1988). As BLM's argument goes, because § 1005(g)(1) allows unproductive leases in unit plans to be extended for five years on a unit-wide basis if they remain unproductive at the end of their primary terms, and because it also provides that leases are *ineligible* for § 1005(g)(1) extensions if they have received § 1005(a) continuations, then § 1005(g)(1) must be read as confirmation that § 1005(a) authorizes production-based continuations on a unit-wide basis. Again,

we are not persuaded. BLM's reasoning overlooks the most straightforward reading of the statute: Regardless of the combination of primary term, continuations or extensions, Congress capped the terms of geothermal leases at fifty years. Consistent with this scheme, leases that receive forty-year continuations under § 1005(a) after becoming productive during their ten-year primary terms are ineligible for the shorter extensions allowed for unproven leases. BLM also overlooks that § 1005(a) says nothing about unit plans, and that § 1005(g)(1) only authorizes extensions, on an individual *or* a unit-wide basis, for leases that do not become productive during their primary terms or § 1005(c) extensions. Contrary to BLM's conclusion, it was entirely consistent for Congress to have provided short unit-wide extensions under § 1005(c) and (g)(1) for unproductive leases that do not individually qualify for lengthy continuations during their primary terms.

BLM also argues that because GSA § 1005(c) and (g)(2) authorize continuations on a unit-wide basis for leases that produce steam in commercial quantities during extended terms, it "defies logic" to think that Congress did not intend to provide unit-wide rewards for production achieved during initial primary lease terms. The reason Congress chose not to incorporate the unitization principle into the GSA's primary term provision is not fully explained by the statute, but in the ordinary case, "our obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995). We have explained why we are not persuaded by BLM's premise that § 1005(a) must allow continuations on a unitized basis because the GSA's primary term provision was modeled after the MLA's primary term provision. Further, given the nature of the emerging geothermal steam market, Congress may have opted against unit-wide continuations during primary terms as a way of incentivizing

exploration on all leases to define the contours of the productive area during the primary term. The decision not to incorporate unit-wide continuations during the primary term still allows leaseholders to benefit from unitization through cost and royalty sharing. It is also consistent with § 1017's mandatory review of unit plans every five years, and with the requirement that unit areas be constricted to eliminate leases not reasonably necessary to unit operations. *See* 30 U.S.C. § 1017. Congress may have been concerned that granting unit-wide continuations during the initial ten-year term would impede development by encouraging operators to select drilling targets based on whether leases were committed to units, rather than on the areas with the greatest potential for production. This is the very concern BLM expressed in 1995. Whatever the case, on the record before us, we do not agree with BLM's assertion that it defies logic to conclude that Congress did not intend to authorize production-based continuations on a unitized basis during primary terms.

BLM's final argument is that § 1005(a)'s legislative history shows that Congress intended the terms of all leases in a unit to benefit if any one of them becomes productive during the primary term. BLM points us to a 1970 House Report:

> Section 6 of the bill provides that each geothermal lease shall be for a primary term of 10 years. If steam is produced or utilized in commercial quantities within this term the lease will continue for so long thereafter as such production or utilization continues, but not to exceed an additional 40 years. If at the end of such 40 years steam continues to be produced in commercial quantities, and the

> land is not needed for other purposes, the
> lessee is given a preferential right to a renewal
> of the lease for a second 40-year period in
> accordance with such terms and conditions as
> the Secretary deems appropriate. *Comparable
> provision* is also made respecting lands leased
> for development under approved cooperative
> and unit plans.

H.R. Rep. No. 91-1544, at 7 (1970) (emphasis added). BLM
argues that the "comparable provision" for leases committed
to unit plans must be § 1017. But it is equally likely that,
when Congress passed the GSA in 1970, this passage was
intended to differentiate § 1005(a) from § 1005(c), the only
provision then authorizing development on a unit-wide
basis.[16] In other words, the passage that BLM relies on may
highlight that Congress adopted a lease-by-lease approach for
production-based continuations during the primary term in
§ 1005(a), and that § 1005(c) authorized a separate but
comparable unit-wide approach for five-year extensions
granted after primary terms, based on drilling. Absent further
context or explanation in the House Report, we find its
reference to "comparable provision" to be inconclusive. *See
Flores-Arellano v. INS*, 5 F.3d 360, 362 (9th Cir. 1993)
(ruling that inconclusive legislative history was insufficient
to overcome unambiguous statutory text). It is BLM's burden
to provide a compelling reason for us to depart from the plain
language of § 1005(a), and we conclude it has not met that
burden here.

---

[16] Section 1005(g)—the other provision authorizing development on
a unit-wide basis—was not added to the GSA until 1988.

## VI. Conclusion

The statutory meaning of 30 U.S.C. § 1005(a) is clear and unambiguous. It only permits production-based continuations on a lease-by-lease basis, not on a unit-wide basis. We therefore affirm the district court's order granting summary judgment in favor of the appellees.

**AFFIRMED.**